**UNITED STATES of America,**
**Appellant,**

v.

**Carmen A. TORTORA,**
**Defendant, Appellee.**

No. 90–2067.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1990.

Decided Dec. 27, 1990.

James D. Herbert, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., and Jeffrey Auerhahn and Gregg L. Sullivan, Asst. U.S. Attys., were on brief for U.S.

Anthony M. Cardinale, Boston, Mass., for defendant, appellee.

Before BREYER, Chief Judge, BROWN *, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

The government appeals an order of the United States District Court for the District of Massachusetts releasing defendant-

_____

* Of the Fifth Circuit, sitting by designation.

appellee Carmen A. Tortora from pretrial detention. The applicable bail statute provides in relevant part that if a "judicial officer finds that no condition or combination of conditions will reasonably assure ... the safety of any other person and the community," the judicial officer shall order the defendant detained pending trial. 18 U.S.C. § 3142(e) (1988).[1] We conclude that the district court erred in ordering Tortora's release.

## I. STATEMENT OF THE CASE

On March 22, 1990, an indictment was returned which charged Tortora and seven others with various crimes, including violations of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §§ 1962(c), (d). The eight men were alleged to be members of the Patriarca Family of the Mafia.[2] Tortora, said to be a soldier, was charged with committing three predicate crimes in furtherance of the RICO enterprise: conspiring to collect an extension of credit by extortionate means; collecting an extension of credit through extortion; and traveling in aid of racketeering. Tortora was also charged with the commission of three substantive crimes, to wit: extortion, 18 U.S.C. § 894; violation of the Travel Act, 18 U.S.C. § 1952; and conspiracy to violate the Travel Act, 18 U.S.C. § 371.

At the arraignment, the government moved to have appellee detained pending trial pursuant to 18 U.S.C. § 3142. Detention hearings were conducted by a magistrate.[3] He concluded that no set of conditions could reasonably assure the community's safety if appellee were freed. Because he determined pretrial detention to be warranted based on dangerousness, the magistrate did not reach the question of whether

there was a sufficient risk of flight to justify detention on that ground as well.

Appellee engaged new counsel and asked the district court to modify or revoke the magistrate's order. A hearing was convened, but no new evidence submitted. The district judge requested that appellee produce a specific release proposal. The proposal was received subsequent to the hearing. The judge found that the suggested conditions reasonably assured the safety of the community and adopted them as the foundation for a release order.

Passing over the boilerplate—the conditions mandated, for example, that the appellee not violate the law, appear at scheduled proceedings, eschew possession of weapons and substance abuse, restrict his travel, etc.—the court's order required the appellee to (1) remain at home twenty-four hours a day, except for a reasonable number of visits to doctors and lawyers, wearing an electronic bracelet; (2) refrain from communicating with any person not approved by the prosecutor and defense counsel; (3) meet with codefendants only in the presence of counsel for the purpose of preparing a defense; (4) allow only one telephone line into his residence, hooking it up to a pen register; and (5) post the residence—a house owned by his brother (who, apparently, agreed to execute the necessary documents)—as security.

We stayed the release order and expedited the government's appeal.

## II. STANDARD OF REVIEW

■ We approach our task mindful of our obligation to afford independent review, tempered by a degree of deference to the determinations made below. See United States v. O'Brien, 895 F.2d 810, 814 (1st Cir.1990). Recognizing that appellate

1. The complete text of 18 U.S.C. § 3142 is set out in an appendix hereto.

2. The record reveals that the Mafia (sometimes called "La Cosa Nostra") is organized around regional mobs called "Families." The Patriarca Family is thought to reign in New England. At the top of the Family hierarchy is the "Boss," who has absolute authority within the Family. The underboss and the consigliere (counselor) are the Boss's principal deputies. The next ech-

elon comprises capo regimes (captains) who are line officers. Soldiers (members) are individuals who are officially "made" or "baptized" into the Family. Associates perform duties for the organization, but are not members of it.

3. A codefendant, Raymond J. Patriarca, the Family's alleged Boss, was detained on the basis of the evidence generated at the same hearings. Patriarca's case is not before us today.

courts are ill-equipped to resolve factbound disputes, this standard cedes particular respect, as a practical matter, to the lower court's factual determinations. *See id.* at 813; *United States v. Bayko,* 774 F.2d 516, 520 (1st Cir.1985). Hence, independent review represents an intermediate level of scrutiny, more rigorous than the abuse-of-discretion or clear-error standards, but stopping short of plenary or *de novo* review. *See Bayko,* 774 F.2d at 519. "If upon careful review of all the facts and the trial judge's reasons the appeals court concludes that a different result should have been reached, the detention decision may be amended or reversed." *O'Brien,* 895 F.2d at 814.

This case requires that we be clear about what it is that we are independently reviewing. The district court's release order comprised simply a handwritten notation on the face of the appellee's proposal, declaring that, "[f]or reasons stated at [the 18 October 1990 nonevidentiary] hearing," the listed conditions "will reasonably assure the safety of the community." This conclusory language accomplished very little in the way of finding subsidiary facts or furnishing needed enlightenment to an appellate tribunal. The judge gave no explanation of why he believed the proposed conditions would prove adequate. Nor were these deficits ameliorated by the reference to the October 18 hearing; having reviewed the transcript of that session, we are unable to discover a meaningful articulation of the court's reasoning or discern its rationale.

■ Were this an appeal of a detention order rather than a release order, the lack of a written statement of particularized reasons would in all probability necessitate vacation of the order. *See* 18 U.S.C. § 3142(i); *see also United States v. Moss,* 887 F.2d 333, 338 (1st Cir.1989) (per curiam); *United States v. Hurtado,* 779 F.2d 1467, 1480 (11th Cir.1985). We believe

that, although not specifically required by the statute, a similar statement of reasons should ordinarily accompany release orders in contested cases. *Accord United States v. Cook,* 880 F.2d 1158, 1162 (10th Cir.1989) (per curiam); *United States v. Coleman,* 777 F.2d 888, 892 (3d Cir.1985); *see also* Fed.R.App.P. 9(a) ("Upon entry of an order ... imposing conditions of release, the district court shall state in writing the reasons for the action taken."). Only in this way will the judicial officer's reasoning be clearly conveyed to the point where an appeals court can most effectively perform its independent review function.

■ While it would be possible for us merely to set aside the release order and remand for a statement of the lower court's reasons, we believe that step to be unnecessary in this case. It appears from the hearing transcript, albeit only translucently, that the district court did not base its release order on new or different factfinding. The court seems instead to have accepted the subsidiary facts as found by the magistrate, concluding only, for reasons not articulated, that a particular set of conditions never suggested to the magistrate could reasonably assure public safety.[4] It is this decision that we must review, in conjunction with the facts as presented in the record and as found by the magistrate, and taking due cognizance of the district court's failure to state its reasons for disturbing the detention order. *See O'Brien,* 895 F.2d at 816 ("we shall give such deference as we think the care and consideration manifested by the magistrate and district court warrant"); *Coleman,* 777 F.2d at 892 (where district court does not set forth reasons supporting its conclusion that accused poses no danger upon release, appellate court must afford less than the usual "respectful consideration" to the district court's conclusion). Hence, appellate review can be satisfactorily accomplished on the existing record.

---

**4.** Perhaps because of this configuration, no mention was made below of the standard by which a district court reviews the magistrate's findings in respect to pretrial detention or release orders. We believe that the proper approach is for the district court to engage in *de* novo review of the contested order. *Accord United States v. Koenig,* 912 F.2d 1190, 1191 (9th Cir.1990); *Hurtado,* 779 F.2d at 1480; *United States v. Maull,* 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc); *United States v. Delker,* 757 F.2d 1390, 1394 (3d Cir.1985).

*See Moss,* 887 F.2d at 338 (meaningful review possible if either the judicial officer initially considering the matter or the district judge provides written statement).

■ Should we independently determine that the release conditions do not reasonably assure community safety, we can either revise the conditions or reverse the order. The first of these options, however, may be more apparent than real. While we could, of course, modify the stated conditions if, on the record before us, there were minor, self-evident adjustments that would make the release conditions adequate, an appellate tribunal is at a considerable disadvantage. Unlike the district court, we do not have a nisi prius function and must, therefore, go very slowly in attempting to fashion neoteric conditions of release—particularly where, as here, there is little evidence of other alternatives and the court below has afforded us no cohesive explanation of its decision.[5]

## III. DISCUSSION

### A. *Detention for Dangerousness.*

■ The Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156, represented a watershed in the criminal law. It transformed preexisting practice in very significant ways, providing among other things for the pretrial detention of persons charged with certain serious felonies on the ground of dangerousness—a ground theretofore not cognizable. *See United States v. Zannino,* 761 F.2d 52 (1st Cir.1985) (upholding pretrial detention under 1984 Act of dangerous defendant released on bail under preexisting law); *see also* S.Rep. No. 225, 98th Cong., 2d Sess. 4–12, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3187–95. To arm this new weapon, the government was obliged to prove clearly and convincingly that no set of release conditions would reasonably assure the community's safety. 18 U.S.C. § 3142(e). In determining whether suitable conditions existed, a judicial officer was required to take into account the following: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence as to guilt or innocence; (3) the history and characteristics of the accused, including past conduct; and (4) the nature and gravity of the danger posed by the person's release. *See* 18 U.S.C. § 3142(g). Danger, in this context, was not meant to refer only to the risk of physical violence. *See* S.Rep. No. 225, *supra,* 1984 U.S.Code Cong. & Admin.News at 3195.

■ Undoubtedly, the safety of the community can be reasonably assured without being absolutely guaranteed. *See United States v. Orta,* 760 F.2d 887, 891–92 (8th Cir.1985) (en banc). Requiring that release conditions *guarantee* the community's safety would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention. *See* S.Rep. No. 225, *supra,* 1984 U.S.Code Cong. & Admin.News at 3189. Thus, we agree with the Eighth Circuit that the courts cannot demand more than an "objectively reasonable assurance of community safety." *Orta,* 760 F.2d at 892.

■ Against this backdrop, the inquiry we must make into the government's appeal of a release order is bifocal in nature. First, we must assay the statutory factors, giving due deference to the gloss placed upon them by the magistrate (and tacitly endorsed by the district judge, *see supra* p. 883) to see if the appellee was properly classified as dangerous. If not, and absent other grounds for detention (e.g., undue risk of flight), the release order should be allowed to operate. But if the finding of dangerousness withstands scrutiny, we must then look at the particular conditions imposed by the district court to determine the likelihood that, upon the defendant's release, public safety will nevertheless be reasonably assured.

---

5. Of course, in a pre-conviction or post-conviction detention appeal, unlike in an ordinary appeal, the court of appeals is free, in determining the appropriateness of the order below, to consider materials not presented to the district court. *See O'Brien,* 895 F.2d at 814 & n. 6; *see also* Fed.R.App.P. 9(a), (b). Here, however, nothing of substance has been presented which would facilitate the exploration of new possibilities.

## B. *The Inquiry into Dangerousness.*

■ In this instance, the first part of our inquiry produces little in the way of serious controversy. The reliable evidence, obtained primarily through court-authorized electronic surveillance, paints a picture which closely conforms with the magistrate's factual findings and with the purposes undergirding Congress's decision to change the rules. We summarize the situation.

Carmen Tortora, 43 years of age, has a checkered criminal past, replete with violence and indications of a total commitment to a life of crime. In 1967, he was convicted of armed robbery and assault with a dangerous weapon and sentenced to 3-to-5 years in prison. In 1972 he was convicted of robbery and assault with a dangerous weapon. That same year, he was convicted on two counts of armed bank robbery and sentenced to fifteen years of incarceration. In 1981, while on parole, Tortora was found guilty of making extortionate loans and collecting credit obligations by extortionate means, receiving an eight year sentence. He was paroled in March 1986 and remained on parole for three years. During the parole period, he allegedly participated in the affairs of the RICO enterprise (the Patriarca Family) and undertook certain criminal activities described in the instant indictment.

In sum, Tortora's curriculum of criminal endeavors encompasses virtually his entire adult life. In addition to his nasty habit of committing crimes while on parole, Tortora has a demonstrated penchant for violence. For example, his 1981 extortion conviction came about after the authorities overheard Tortora threatening his selected victim as follows:

> I'm gonna split your motherfuckin' head open if I don't start getting some money! This fuckin' bullshit, fuckin' hidin', I'll cut your fuckin' throat! Now,

you get me some motherfuckin' money down there! ... Or the next time I see ya, I'll send the guys out to split your fuckin' head open! I'll tell them to cut your motherfuckin' head off.

Tortora's arrest on this occasion was viewed by his Family superiors as merely a step in his professional development—a view which Tortora apparently shared. Before his case came to trial, Tortora visited two high-ranking members of the organization who gave him words of encouragement, advised him to plead guilty (advice which he heeded), and arranged some financial support.

■ Tortora's history and character go hand-in-hand with his lengthy involvement with La Cosa Nostra.[6] We have already discussed his 1981 conviction for extortion. Another predicate act involves a conspiracy to collect extortionate credit, the prime evidence of which is a recorded conversation between Tortora and his capo regime, Vincent M. Ferrara. The final predicate act is even more damning: Tortora is accused of violating the Travel Act by participating in a ritualistic ceremony inducting new members (Tortora included) into the Patriarca Family. During the meeting, Tortora swore lifelong allegiance to the Mafia and agreed to murder any individual who posed a threat to it. On inquiry, he vowed to kill his brother if the latter posed a danger to any member of the organization. In essence, Tortora made the Mafia his highest priority in life and pledged fealty to its needs, whatever the circumstances. As the district judge observed: "I think a fair reading ... of that meeting was that there was a commitment by all to do whatever was necessary, an oath, whatever it costs to who[m]ever else was involved, to further the objectives of this so-called organization."

Applying the criteria of section 3142(g), summarized *supra* p. 884, to these facts

---

**6.** Citing *United States v. Phillips,* 732 F.Supp. 255, 264 (D.Mass.1990), the appellee argues that federal courts may not consider associational ties as a factor in measuring a person's likely *dangerousness.* We find this asseveration specious. Tortora's association with a criminal cabal, his membership in a Family, and his avow- als to further the Family's goals through illicit activity, are highly relevant considerations under 18 U.S.C. § 3142(g). Appellee is being judged, as he should be, as an individual, with one relevant characteristic being his devotion to the Mafia and his pledge to violate the law whenever necessary to further its ends.

leaves little doubt that Tortora is precisely the type of defendant Congress had in mind when it wrote of the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." *See* S.Rep. No. 225, *supra,* 1984 U.S.Code Cong. & Admin.News at 3189. The case for dangerousness, we suggest, is so unarguable that we can simply superimpose Tortora's track record on the section 3142(g) mosaic in shorthand form:

1. Tortora was indicted for crimes of violence, *see* 18 U.S.C. § 3156(a)(4) (defining "crime of violence"); he has a long criminal history marked by thuggery; violence has been the hallmark of his substantive activities on the Mafia's behalf; and his statements during the induction ceremony reflected an abiding commitment to the use of deadly force.

2. There is no indication that Tortora is debilitated in any way that might hinder him in continuing to commit violent crimes.

3. The evidence of Tortora's guilt is both substantial and credible. The government's case is based in large part on direct evidence, including tape recordings. While the admissibility of the recordings may be an issue at trial, that circumstance does not preclude their use at a bail hearing. *See, e.g., United States v. Angiulo,* 755 F.2d 969, 974 (1st Cir.1985).

4. We think it quite significant that Tortora's criminal activities persisted throughout most of his adult life, even while he was on supervised release. The offense underlying his 1981 conviction, as well as other acts attributed to him in this indictment, occurred while he was on parole. By

any realistic measure, this history is a telling indicator that he cannot be trusted to abide by conditions of release.

5. Tortora has sworn an oath to kill informants and his past shows him to be capable of violent crime. Therefore, it is likely that the danger he would pose to society, if released, would be grave.

6. Certainly, Tortora's ties to home and hearth do not militate against his future criminal involvement. After all, he agreed to kill his brother and desert his mother on her death bed if in the Mafia's best interests. Put bluntly, there is every reason to believe that he will prefer Family over family.

In sum, the facts as found by the magistrate constitute clear and convincing evidence that Tortora is virtually a paradigm of the criminal who, within the contemplation of the Bail Reform Act, might plausibly be subjected to pretrial detention on grounds of dangerousness.[7]

### C. *The Inquiry into the Release Conditions.*

 We turn next to the other half of the equation: whether the conditions imposed by the district court were reasonably adequate to assure the community's safety, notwithstanding Tortora's dangerousness. We approach this inquiry mindful both of the respect due to the court below and of our responsibility to exercise independent oversight. *See supra* Part II.

We have listed the salient conditions, *supra* p. 882, and it would be pleonastic to recite them anew. They are admittedly elaborate and extensive. But they have an Achilles' heel: if there is a unifying theme in this intricate set of restrictions, it is that virtually all of them hinge on the defendant's good faith compliance.[8] To illus-

---

7. To be sure, there are integers in the section 3142(g) calculus which count in defendant's favor. He lives with his wife and children in Brockton, Massachusetts. He is employed at a video store owned by his wife. There is no evidence that he is a substance abuser. When released on bail in prior cases, he appeared for court dates on schedule. But, the factors favoring release are plainly outweighed by the factors favoring detention.

8. The lone exception is the condition that the house be posted as security. Once this is accomplished, Tortora cannot easily evade its effect. The efficacy of the condition in achieving its purpose is, however, suspect. There is evidence that Tortora's allegiance to crime and the Patriarca Family are far more important to him than his allegiance to his brother (who owns the dwelling). Furthermore, there is considerable uncertainty as to whether the law would allow

trate, electronic monitoring, while valuable in pretrial release cases (especially in allowing early detection of possible flight), cannot be expected to prevent a defendant from committing crimes or deter him from participating in felonious activity within the monitoring radius. Second, by allowing outside visits to doctors and lawyers, the conditions open up a sizeable loophole; there is no feasible way of assuring that Tortora, while en route to and from such appointments, will not make stops and take detours with a view toward continuing his criminal life. House arrest poses much the same problem; limiting visitors can only work, for example, if the appellee submits the names of potential guests for clearance. The only enforcement mechanism provided to ensure that Tortora properly restricts his contacts is a requirement that Tortora keep a record of those contacts—a mechanism which, itself, is honor-dependent. Finally, the monitoring of Tortora's sole telephone line can be easily evaded by, say, the surreptitious introduction into his home of a cellular telephone or stopping at a pay telephone while headed for an authorized appointment.

Consequently, we find that the conditions as a whole are flawed in that their success depends largely on the defendant's good faith—or lack of it. They can be too easily circumvented or manipulated. Such a flaw takes on great significance where, as in this case, little about the defendant or his history suggests that good faith will be forthcoming. If past is prologue, then promises to hew the straight and narrow will mean next to nothing to this defendant. In our estimation, the conditions fail to offer an objectively reasonable assurance of safety to the community.

■■■ At oral argument, it was hinted that, if dubiety reigned, we could simply tighten the vise by amending the conditions of release. We think such a course impracticable here. Given the breadth of human imagination, it will always be possible to envision some set of release conditions which might reasonably assure the safety of the community. For instance, agents could be posted by the government to watch Tortora at all times to ensure that he remains compliant; the guards could search all visitors, dog Tortora's footsteps en route to all appointments, and otherwise act as private jailers. But the Bail Reform Act, as we read it, does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consists of heroic measures beyond those which can fairly be said to have been within Congress's contemplation. We explain briefly.

18 U.S.C. § 3142(c)(1) requires the imposition of protective conditions as a corollary to the release of defendants who would otherwise pose a danger to the community. The statute lists thirteen particular conditions to be considered, followed by a catch-all clause instructing the judicial officer to impose "any other condition that is reasonably necessary to assure ... the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(xiv).

In construing this provision, the doctrine of *ejusdem generis* clearly applies, that is, where a general term follows specific terms in a statutory enumeration, the general term is to be construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. *See, e.g., Macaulay v. Boston Typographical Union No. 13*, 692 F.2d 201, 204 (1st Cir.1982). The doctrine applies when, as here, the specific terms of an enumeration suggest a class which is not exhausted by the enumeration. In this instance, the initial thirteen elements, while quite varied, suggest a class of conditions well below the level of heroic measures. Moreover, if Congress intended that all possible conditions could be imposed under § 3142(c)(1)(B)(xiv), then there would be no room for pretrial detention because the safety of the community can almost always be assured if extraordinary conditions of release are imposed. Therefore, the gener-

---

the house to be forfeited if Tortora kept his scheduled court dates but violated some other condition of his release by, say, committing a new crime. Real estate as security seems a much more effective condition of release in a "flight risk" case than in a "dangerousness" case.

al language of the catch-all clause must be read in a limited way. On this basis, it becomes readily apparent that there is no appropriate corrective adjustment we can order to remedy the serious deficiency in the proposed conditions of Tortora's release.

In asserting that the restrictions are satisfactory to justify his liberty, appellee makes five interrelated arguments. He claims that the conditions achieve a reasonable level of adequacy; that deference to the court below suggests that the release order be affirmed; that fundamental fairness supports his release because similarly situated individuals have been set free; that pretrial confinement will, in his case, likely last so long as to impact upon his constitutional rights; and that the public interest would be more poorly served by keeping him in prison. We find this asseverational array unconvincing in all its aspects.

In view of what we have already written, we need not linger over the first three arguments. Whether or not the stipulated conditions might be adequate in another case, or for another defendant, is beside the point. As mentioned above, our concern in this case, given the known characteristics and proven proclivities of this defendant, is less for the theoretical adequacy of the conditions than for their practical adequacy. Nor can Tortora draw much solace either from the district judge's assessment or from pretrial release of certain of his confederates.

As to the first, in a situation where a standard of independent review controls and where the judge (1) took no evidence, (2) accepted the magistrate's finding of dangerousness, and (3) gave no statement of reasons why he thought the release conditions proposed by Tortora's counsel would work effectively, the deference we can accord the release order is severely limited. This is especially true when, as here, the magistrate, who presided at the evidentiary hearing and made the pertinent factual determinations concluded unequivo-

cally that "[n]o reasonable condition or combination of conditions—short of pretrial detention—will reasonably assure the safety of the community as it relates to the defendant Tortora." The deference properly due to the district court's assessment is, we think, outweighed by the considerations we have mentioned.

The argument that the conditions are at least as confining as those imposed on two other alleged members of the Patriarca Family, Biagio DiGiacomo and Antonio L. Spagnolo (who were charged in a separate albeit comparable indictment and granted pretrial release by a different district judge in the interim between the magistrate's order detaining Tortora and the district court's order releasing him, *see United States v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass.1990)), misses the point.[9] Appellee stresses the DiGiacomo example on the thesis that DiGiacomo outranked Tortora in the Mafia hierarchy and thus, as a leader, posed a special threat to the community. *See, e.g., United States v. Zannino*, 798 F.2d 544, 547 (1st Cir.1986) (per curiam). For illustrative simplicity, we will slight Spagnolo, who was released by the same order and under the same conditions as DiGiacomo, and explain why we find appellee's reliance on the DiGiacomo example unpersuasive.

▪ Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant. *See Hurtado*, 779 F.2d at 1478; *Phillips*, 732 F.Supp. at 264; *United States v. Jeffries*, 679 F.Supp. 1114, 1116 (M.D.Ga.1988); *United States v. Knight*, 636 F.Supp. 1462, 1467 (S.D.Fla.1986). The inquiry is factbound. No two defendants are likely to have the same pedigree or to occupy the same position.

▪ Even a cursory comparison of the situations of DiGiacomo and Tortora hammers home these verities. There are at least two major differences. Tortora, a proven parole violator, had a busy and bru-

---

**9.** Insofar as we are aware, the government elected not to appeal these release orders. At any rate, both DiGiacomo and Spagnolo have reportedly entered into plea agreements.

tal criminal past. DiGiacomo, in contrast, had no previous criminal record. *See DiGiacomo,* 746 F.Supp. at 1185. The second distinction is even more fundamental. The district court found that DiGiacomo would be likely to satisfy his legal obligations, such as release conditions. *See id.* at 1180. The magistrate in the instant case made exactly the opposite finding with respect to Tortora, stating that he (Tortora) "by his own words and deeds, has already demonstrated that conditions are not worth the paper on which they are written." The district judge did not pass upon, let alone explicitly overrule, this finding of fact. Thus, Tortora's case and DiGiacomo's case, despite what they may have in common, are not fair congeners.[10]

■ Appellee next implores us to consider the possible length of his pretrial confinement and the rigors attendant thereto. While we are not blind either to the passage of time—appellee has already been held for more than half a year and his trial (which may last up to eight months) is not likely to start until early 1991—or to the harshness which pretrial detention works in such circumstances, Congress was surely aware of this potential when it enacted 18 U.S.C. § 3142. Nevertheless, Congress conspicuously omitted any instruction to consider the potential length of detention as part of the pretrial release calculus. The Supreme Court has upheld section 3142 on its face against a constitutional attack. *See United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Since *Salerno,* it has been accepted that due process challenges to pretrial detention, as applied, must be resolved on a

case-by-case basis. *See, e.g., United States v. Hare,* 873 F.2d 796, 801 (5th Cir.1989). At this stage of the proceedings, Tortora's pretrial incarceration has not been so protracted as to support a due process claim. *Compare, e.g., Zannino,* 798 F.2d at 547–49; *United States v. Accetturo,* 783 F.2d 382, 388 (3d Cir.1986). Because the duration of further immurement is still speculative, consideration of whether an appreciably longer incarcerative period would constitute a violation of constitutional or statutory law in Tortora's case is presently unripe.[11] *See Accetturo,* 783 F.2d at 388; *United States v. Colombo,* 777 F.2d 96, 100–01 (2d Cir.1985).

■ Appellee's last argument is mindboggling in its implication. He cites to the principle stated in *Phillips,* 732 F.Supp. at 267, that the issue to "be addressed is whether the defendant's *release* would pose a danger to the community that would not exist if the defendant were held in pretrial preventive detention;" and contends that, even if the stated conditions are not adequate to assure the safety of the community in an objectively reasonable sense, the release order was justified because, if kept in prison, he will have at least as much ability to commit crimes as he would have if released. We find the *Phillips* principle perverse. The Bail Reform Act does not ordain that dangerousness upon release is to be measured relative to dangerousness if incarcerated, *cf. Colombo,* 777 F.2d at 98, and for good reason: the ability of an incarcerated person to commit crimes while in jail is a problem for the Executive Branch to solve.

---

**10.** Although each bail applicant must be screened individually, it is interesting to note that DiGiacomo's codefendant, Spagnolo, when compared to Tortora, is set apart equally well. Spagnolo had an arrest record, but no prior convictions. *See DiGiacomo,* 746 F.Supp. at 1186. Moreover, Judge Wolf, who granted pretrial release to DiGiacomo and Spagnolo, wrote that the latter "constitut[ed] less of a threat to safety than DiGiacomo." *Id.* at 1189.

**11.** Similarly, appellee's argument that his place of incarceration is so distant and inconvenient as to interfere with his ability to consult with his attorneys and prepare a defense consists at this juncture of rank supposition. In the ab-

sence of a concrete factual predicate—and none was offered below—the suggestion is too speculative to be evaluated in either constitutional or statutory terms. *Cf. United States v. Lyons,* 898 F.2d 210, 216 n. 6 (1st Cir.) (refusing to grant new trial based on similar allegation in the absence of evidence that relationship between pretrial detainee and his counsel was actually prejudiced by location of detention facility), *cert. denied,* —— U.S. ——, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). In any event, such geographic factors do not appear to be germane in considering pretrial release of dangerous defendants under the Bail Reform Act of 1984.

The idea that someone who otherwise ought not to be released should be let loose by the courts because his jailers may not prevent him from committing crimes while in prison comprises a classic non sequitur, alien to the Bail Reform Act, to its legislative history, and to common sense.

## IV. CONCLUSION

We need go no further. On independent review of the facts and determinations below, and with due regard to the decisions of the magistrate and the district judge, we conclude that Tortora should not be set at liberty at this stage of the proceedings. In our judgment, the safety of the community cannot reasonably be assured should the appellee be released subject to the proposed conditions or to any readily ascertainable combination of practicable restrictions.[12] We therefore sustain the government's appeal, vacate the release order, reinstate the magistrate's earlier order for pretrial detention, and remand for further proceedings not inconsistent herewith.

*Vacated and remanded.*

### STATUTORY APPENDIX

### § 3142 Release or detention of a defendant pending trial

**(a) In general.**—Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be—

 (1) released on personal recognizance or upon execution of an unsecured appearance bond, under subsection (b) of this section;

 (2) released on a condition or combination of conditions under subsection (c) of this section;

 (3) temporarily detained to permit revocation of conditional release, deportation, or exclusion under subsection (d) of this section; or

 (4) detained under subsection (e) of this section.

**(b) Release on personal recognizance or unsecured appearance bond.**—The judicial officer shall order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court, subject to the condition that the person not commit a Federal, State, or local crime during the period of release, unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.

**(c) Release on conditions.**—(1) If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person—

 (A) subject to the condition that the person not commit a Federal, State, or local crime during the period of release; and

 (B) subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person—

 (i) remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community;

 (ii) maintain employment, or, if unemployed, actively seek employment;

 (iii) maintain or commence an educational program;

---

**12.** We refuse to speculate about, and therefore take no view of, whether the district court, on a proper showing, could possibly devise some sort of special "pretrial house arrest" as suggested by our concurring brother, *post* at 895, which might allow the defendant's release from pretrial detention.

(iv) abide by specified restrictions on personal associations, place of abode, or travel;

(v) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

(vi) report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

(vii) comply with a specified curfew;

(viii) refrain from possessing a firearm, destructive device, or other dangerous weapon;

(ix) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), without a prescription by a licensed medical practitioner;

(x) undergo available medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

(xi) execute an agreement to forfeit upon failing to appear as required, such designated property, including money, as is reasonably necessary to assure the appearance of the person as required, and post with the court such indicia of ownership of the property or such percentage of the money as the judicial officer may specify;

(xii) execute a bail bond with solvent sureties in such amount as is reasonably necessary to assure the appearance of the person as required;

(xiii) return to custody for specified hours following release for employment, schooling, or other limited purposes; and

(xiv) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

(2) The judicial officer may not impose a financial condition that results in the pretrial detention of the person.

(3) The judicial officer may at any time amend the order to impose additional or different conditions of release.

**(d) Temporary detention to permit revocation of conditional release, deportation, or exclusion.**—If the judicial officer determines that—

(1) such person—

(A) is, and was at the time the offense was committed, on—

(i) release pending trial for a felony under Federal, State, or local law;

(ii) release pending imposition or execution of sentence, appeal of sentence or conviction, or completion of sentence, for any offense under Federal, State, or local law; or

(iii) probation or parole for any offense under Federal, State, or local law; or

(B) is not a citizen of the United States or lawfully admitted for permanent residence, as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)); and

(2) the person may flee or pose a danger to any other person or the community;

such judicial officer shall order the detention of the person, for a period of not more than ten days, excluding Saturdays, Sundays, and holidays, and direct the attorney for the Government to notify the appropriate court, probation or parole official or State or local law enforcement official, or the appropriate official of the Immigration and Naturalization Service. If the official fails or decline to take the person into custody during that period the person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings. If temporary detention is sought under paragraph (1)(B) of this subsection, the person has the burden of proving to the court such person's United States citizenship or lawful admission for permanent residence.

**(e) Detention.**—If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial. In a case described in subsection (f)(1) of this section, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community if such judicial officer finds that—

(1) the person has been convicted of a Federal offense that is described in subsection (f)(1) of this section, or of a State or local offense that would have been an offense described in subsection (f)(1) of this section if a circumstance giving rise to Federal jurisdiction had existed;

(2) the offense described in paragraph (1) of this subsection was committed while the person was on release pending trial for a Federal, State, or local offense; and

(3) a period of not more than five years has elapsed since the date of conviction, or the release of the person from imprisonment, for the offense described in paragraph (1) of this subsection, whichever is later.

Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), section 1 of the Act of September 15, 1980 (21 U.S.C. 955a), or an offense under section 924(c) of title 18 of the United States Code.

**(f) Detention hearing.**—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of the person as required and the safety of any other person and the community—

(1) upon motion of the attorney for the Government, in a case that involves—

(A) a crime of violence;

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or section 1 of the Act of September 15, 1980 (21 U.S.C. 955a); or

(D) any felony if the person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

(2) upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves—

(A) a serious risk that the person will flee; or

(B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion of the person may not exceed five days, and a continuance on motion of the attorney for the Government may not exceed three days. During a continuance, the person shall be detained, and the judicial officer, on motion of the attor-

ney for the Government or sua sponte, may order that, while in custody, a person who appears to be a narcotics addict receive a medical examination to determine whether such person is an addict. At the hearing, such person has the right to be represented by counsel, and, if financially unable to obtain adequate representation, to have counsel appointed. The person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence. The person may be detained pending completion of the hearing. The hearing may be reopened before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community.

(g) **Factors to be considered.**—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, em-

ployment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(2)(K) or (c)(2)(L) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

(h) **Contents of release order.**—In a release order issued under subsection (b) or (c) of this section, the judicial officer shall—

(1) include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct; and

(2) advise the person of—

(A) the penalties for violating a condition of release, including the penalties for committing an offense while on pretrial release;

(B) the consequences of violating a condition of release, including the immediate issuance of a warrant for the person's arrest; and

(C) sections 1503 of this title (relating to intimidation of witnesses, jurors, and officers of the court), 1510 (relating to obstruction of criminal investi-

gations), 1512 (tampering with a witness, victim, or an informant), and 1513 (retaliating against a witness, victim, or an informant).

**(i) Contents of detention order.**—In a detention order issued under subsection (e) of this section, the judicial officer shall—

(1) include written findings of fact and a written statement of the reasons for the detention;

(2) direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

(3) direct that the person be afforded reasonable opportunity for private consultation with counsel; and

(4) direct that, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the person is confined deliver the person to a United States marshal for the purpose of an appearance in connection with a court proceeding.

The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

**(j) Presumption of innocence.**—Nothing in this section shall be construed as modifying or limiting the presumption of innocence.

BREYER, Chief Judge (concurring).

I agree with the panel majority on three points:

1) The record makes clear that the appellee's release, under ordinary conditions of bail, would pose a serious threat to "the safety of ... other person[s] and the community." 18 U.S.C. § 3142(e). It reveals a past record of violent behavior; a likelihood that appellee swore the most solemn oaths committing him to silence, indeed to kill, witnesses and others at his confederates' bidding; and strong evidence of present crimes carrying severe penalties; all of which together demonstrate that judicial authorities cannot trust him and that he is the sort of person Congress had in mind when enacting the "preventive detention" provisions of the Bail Reform Act. *See* 18 U.S.C. § 3142(g); S.Rep. No. 225, 98th Cong., 2d Sess. 9, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3192. The magistrate so found. The district court did not find to the contrary. The record requires such a finding.

2) The record indicates that appellee's circumstances differ significantly from those of his alleged associates Biagio DiGiacomo and Antonio Spagnolo, whom the district court released on conditions similar to those involved here. *See United States v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass. 1990). In the case of DiGiacomo and Spagnolo, the court, prior to releasing them (to a form of house arrest), carefully analyzed the danger they posed. On the one hand, the court recognized that house arrest, compared with incarceration, would make it "at least marginally easier ... to direct criminal activity...." *Id.* at 1188. On the other hand, the court noted that the two defendants had been fully aware for the previous three years of the government's forthcoming prosecution, the evidence that it would likely present, and the likely witnesses against them, yet they did not "directly or indirectly" threaten, injure, or attempt to intimidate any government agent or witness "in the three years prior to ... indictment." *Id.* at 1187–89. The district court in this case provided no such analysis, it pointed to no such offsetting feature, and the government says it could not have done so, for the appellee in this case was, in effect, surprised by the indictment.

3) There is no explanation at all in the record as to how the pre-trial conditions—the wearing of an electronic bracelet that would mark the appellee's whereabouts, a pen-register on his telephone, and appellee's *promise* not to contact unapproved persons—will prevent the appellee from engaging in the most obvious serious risk, namely his planning with others to silence

witnesses. Of course, should the government *catch him* communicating with unapproved persons, his brother's house is forfeited. But, why could the appellee not communicate with visitors inside the house; why could he not obtain an unauthorized telephone; why could he not communicate at night through a window? After all, the electronic bracelet tells the government where he is, it helps prevent flight, but it does not tell the government who is with him, whom he speaks to or what he says. In other words, the record, while explaining that defendant *promises* not to plan crimes, is totally silent as to how the government can catch the defendant if he does so. It does not discuss the costs or obstacles involved in supervising compliance with the conditions.

I part company with the majority, however, if it means to imply that, given proper record evidence and findings, the district court lacks the legal power to create and to impose a kind of "pre-trial house arrest" upon a defendant such as this one. The statute says that if a "judicial officer finds that *no condition or combination of conditions* will reasonably assure ... the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e) (emphasis added). I agree that the underlined language does not refer to outlandish conditions, such as requiring several government agents to follow a defendant wherever he goes. Yet, when describing conditions, the statute refers to the court's power to impose "any other condition that is *reasonably necessary* to assure ... the safety of any other person and the community." 18 U.S.C. § 3142(c)(B)(xiv) (emphasis added). It seems to me that what is "reasonably necessary" depends upon the circumstances. Where two or three years of *pre-trial* detention is at stake, and detention is in a distant facility, requiring counsel to drive several hours to confer with his client, conditions that impose cost burdens upon the government might well seem more "reasonabl[e]" than in more usual circumstances. Indeed, if conviction follows, it may prove possible to recoup extra costs

through a punitive fine. *See* United States Sentencing Commission, *Guidelines Manual*, § 5E1.2(i) (Nov.1989). I should leave an evaluation of "house arrest" and the government's related claim that courts cannot impose conditions that (to secure "safety") work a "tremendous financial burden," all to a later time. It is sufficient here that the record fails to make even a minimal demonstration as to how the conditions imposed meet the threat revealed.