960 F.2d 143
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
Vincent "Mickey" HURLEY, Defendant, Appellant.
 92-1068.
 United States Court of Appeals, First Circuit.
 April 22, 1992
 
 Frederick G. Cass, on brief for appellant.
 Lincoln C. Almond, United States Attorney, James H. Leavey and Margaret E. Curran, Assistant United States Attorneys, on brief for appellee.
 Before Breyer, Chief Judge, Campbell, Senior Circuit Judge, and Selya, Circuit Judges.
 Per Curiam.
 
 
 1
 A 152-count indictment returned in November 1991 charges thirteen persons with various offenses in connection with an alleged international money-laundering scheme. Vincent Hurley, one of the named defendants, here appeals from a district court order under 18 U.S.C. § 3142(e) directing that he be detained pending trial due to risk of flight. We find that the government has sustained its burden of establishing by a preponderance of the evidence that no conditions of release will reasonably assure Hurley's appearance at trial. We therefore affirm.
 
 
 2
 The indictment, returned in Rhode Island federal court, charges Hurley with one count of RICO conspiracy, 18 U.S.C. § 1962(d), four counts of failure to file Currency Transaction Reports, 31 U.S.C. § 5324(1), three counts of structuring violations, id. § 5324(3), and two counts of Travel Act offenses, 18 U.S.C. § 1952(a)(3). On December 2, 1991, a magistrate-judge (magistrate) held a detention hearing and ordered that Hurley be detained because of risk of flight. Three weeks later, the magistrate granted Hurley's motion for reconsideration and ordered his release under stringent conditions, including full surety of $400,000 and a nightly curfew. The district court, in turn, reimposed detention following a de novo hearing on December 30, 1991, and this appeal ensued.[1] We undertake an independent review of the detention order, tempered by deference to the district court's determinations, particularly its factual findings. See, e.g., United States v. Patriarca, 948 F.2d 789, 791 (1st Cir. 1991); United States v. Tortora, 922 F.2d 880, 882-83 (1st Cir. 1990).
 
 
 3
 The evidence below[2] showed that Hurley was involved in an organization which laundered hundreds of millions of dollars of drug proceeds for Colombian drug cartels. The organization, which was headed by codefendant Stephen Saccoccia, functioned on a commission basis; it had no involvement in the underlying drug activity itself. The scheme operated, in the main, as follows. Large volumes of cash would be delivered by courier to Saccoccia in New York City. In accordance with faxed instructions, much of the cash would then be shipped, by armored car or private vehicle, to either of two companies owned by Saccoccia in Cranston, Rhode Island: Trend Precious Metals (Trend) and Saccoccia Coin Company. These two companies together constituted the headquarters for the Rhode Island branch of the organization. In 1990 and early 1991, such shipments occurred almost daily and would typically contain hundreds of thousands of dollars in small denominations. Once in Rhode Island, the money would be counted on an automatic counting machine and sorted. Pursuant to Saccoccia's instructions, it would then be taken to area banks and used to purchase cashier's or treasurer's checks. These transactions were frequently "structured" so that the amounts were less than $10,000-a device designed to avoid the filing of a Currency Transaction Report. On other occasions, when the purchases exceeded that amount, the defendants caused false reports (or no reports at all) to be filed. The checks were made payable to Trend or other dummy companies controlled by Saccoccia-businesses ostensibly engaged in such trades as gold or jewelry that would be expected to generate large quantities of cash.[3] The checks would be deposited in those companies' accounts, and the funds later transferred to a central account maintained by Trend at a Providence bank. The evidence shows that, between January 1990 and April 1991, over $30 million was deposited into this clearinghouse account in such a manner. From there, the money would be wired to bank accounts in Colombia and elsewhere.[4]
 
 
 4
 The indictment charges, and the district court found, that Hurley helped to supervise the organization's Rhode Island operations through his base at Saccoccia Coin Company-communicating frequently with Saccoccia, participating in the receipt of cash, and overseeing its deposit into the various bank accounts. In addition, there was evidence showing the following. Hurley (who is described in one affidavit as Saccoccia's brother-in-law) was present on several occasions with him in New York when cash was delivered. A search of Hurley's residence found $67,000 in cash, numerous ounces of gold, and several firearms, including a .44 magnum pistol. Intercepted conversations revealed that Hurley, along with other defendants, routinely used code words designed to make references to cash sound like discussions of precious metals.[5] He and the others repeatedly spoke of security measures, such as obtaining cellular telephones in the belief that they were less vulnerable to wiretapping. According to the government's proffers, Hurley was overheard on November 26, 1990 agreeing to "fence" $132,000 in gold that had been stolen in an armed robbery earlier that day. He was overheard a month later stating, "We're not coin dealers; we're fences." And he was overheard threatening to "get" an IRS agent if that agent bothered his mother or father.[6]
 
 
 5
 On his own behalf, Hurley presented evidence of substantial ties to the community. He is 34-year-old native and life-long resident of Rhode Island who has resided in Cranston for the past two years. He has a four-year-old daughter, for whom he pays monthly child support, and lives with his girlfriend, to whom he is contemplating marriage. His parents also live in Cranston; his father is a double-amputee Korean War veteran. In addition, Hurley has no criminal record. He claims to be indigent. While he apparently owns no real estate himself, his parents and two sisters have all agreed to post their houses as security. And he states that, if released on bail, he could find employment as a trailer salesperson or apprentice plumber.[7]
 
 
 6
 We agree with the district court that, notwithstanding these "admittedly significant" factors, the government has sustained its burden of proving by a preponderance of the evidence that no conditions of release would reasonably assure Hurley's appearance at trial. Even substantial community ties can be outweighed by strong countervailing evidence of risk of flight. See, e.g., United States v. Palmer-Contreras, 835 F.2d 15 (1st Cir. 1987) (per curiam). We think such evidence exists here. Hurley concedes that he faces a potential prison term in excess of fifteen years. Based on the present record, the evidence against him-consisting largely of intercepted oral communications-would appear to be strong. Together, these factors provide a considerable incentive to flee. And from the nature of the organization and Hurley's role in it, the inference is compelling that he likely has access to the financial resources and international contacts that would provide him with the means to flee and thereafter to absorb the cost of any security that is forfeited by relatives or friends.
 
 
 7
 In addressing this latter consideration, the district court deemed relevant-at least by analogy-the congressional findings giving rise to the rebuttable presumption of flight created by 18 U.S.C. § 3142(e) as to major drug offenders.[8] Hurley on appeal claims that such reliance was error. Yet the district court did not purport to apply the presumption itself (recognizing that Hurley had not been charged with any offense to which it applies). Rather, it simply noted that the same policy considerations underlying the statutory presumption were applicable here. As another court has explained:
 
 
 8
 " [M]oney laundering" is an integral part of the narcotics business. The same factors which create an unusually high risk of flight in narcotics offenses and which form the basis for the statutory presumption are present here-the business is extremely lucrative and those involved have established substantial ties outside the United States. Thus, persons involved in money laundering, just as those involved in narcotics trafficking, have the resources and foreign contacts to escape to other countries to avoid prosecution.
 
 
 9
 United States v. Botero, 604 F. Supp. 1028, 1033 (S.D. Fla. 1985), aff'd mem. 853 F.2d 928 (11th Cir. 1988). Whether a person accused of money laundering can be presumed, in the absence of any direct evidence thereof, to have access to such "resources and foreign contacts" is a question we need not decide. For that is not what occurred here. Rather, the organization's close links to Colombian drug cartels and the ready availability of large sums of cash were both established by direct evidence-evidence which Hurley has not attempted to dispute.
 
 
 10
 Hurley also contends that the district court erred in finding that he played a supervisory role in the organization's Cranston, Rhode Island operations. Based on the evidence presented, we agree that he was not the ranking person in the local hierarchy; that role appears to have been filled by codefendant David Izzi. It is also true that Hurley appears not to have conducted any of the actual bank transactions himself.[9] We are not persuaded, however, by his argument that his rank in the organization was no higher than that of other defendants who have been released on bail. To the contrary, as the government argued and the district court implicitly found, Hurley appears to have been second-in-command in Rhode Island. Among other evidence, his nearly-daily conversations with Saccoccia (and Izzi) and his occasional visits with Saccoccia in New York warrant a finding that he played a supervisory role-receiving and implementing instructions from Saccoccia and overseeing the receipt and subsequent disposition of the drug proceeds. Given the organization's access to large sums of money and foreign contacts, a substantial risk of flight might be deemed present even with respect to someone lower in the hierarchy. Cf. United States v. Dillon, 938 F.2d 1412, 1416-17 (1st Cir. 1991) (per curiam) (applying presumption to uphold pretrial detention of individual with strong local ties who participated only marginally in attempted drug purchase); Palmer-Contreras, 835 F.2d at 18 (same; defendants served as "mules" in drug importation scheme). Here, in light of Hurley's supervisory position and the other factors recited above, we think the district court's determination was well warranted.
 
 
 11
 Finally, Hurley advances a pair of arguments challenging the constitutionality of his detention on the ground that pretrial proceedings are likely to be protracted. We are told that Saccoccia and his wife (who is also a defendant) were arrested in Switzerland and are fighting extradition; trial must await resolution of that matter. Furthermore, the government's evidence in this case includes over 1600 hours of tape recordings and over 5000 pages of handwritten logs summarizing the contents thereof, all of which must be scrutinized by the defendants. Hurley first argues that, in light of these circumstances, his pretrial detention is likely to be so extended as to violate due process, such that he should now be released. We rejected an identical argument in Tortora:
 
 
 12
 At this stage of the proceedings, Tortora's pretrial incarceration has not been so protracted as to support a due process claim. Because the duration of further immurement is still speculative, consideration of whether an appreciably longer incarcerative period would constitute a violation of constitutional or statutory law in Tortora's case is presently unripe. 922 F.2d at 889 (citations and footnote omitted). Tortora had been held "for more than half a year," id., at the time of that decision-longer than Hurley has been detained here. Hurley attempts to distinguish Tortora on the ground that, whereas he is being held due to risk of flight, Tortora was held because of dangerousness. Yet he fails to explain, and we fail to see, how this distinction makes any difference for purposes of a due process analysis.
 
 
 13
 Hurley's second argument is that his continued detention will prevent him from reviewing the tapes and logs with his counsel, thereby violating the Sixth Amendment. As a basis for revoking the order of detention, this argument falls well short. Hurley, however, has a right to listen to the tapes and review the logs in the company of his attorney. See, e.g., Dillon, 938 F.2d at 1417 (noting that appellant was to be afforded "reasonable opportunity" for private consultations with his attorney). If suitable arrangements cannot be made at the institution where Hurley is currently detained, it may well be desirable for the parties and the district court to work together to fashion some other alternative. See 18 U.S.C. § 3142(i) ("The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.") We need not, however, address the matter further at this juncture, as no particular issue in this regard is before us.
 
 
 14
 The order of detention is affirmed.
 
 
 
 [1]
 David Izzi, one of Hurley's codefendants, filed a companion appeal from a similar detention order but later opted for voluntary dismissal. Consideration of the instant appeal has been delayed in part by the fact that Hurley first requested leave to file a supplemental brief and then withdrew that request
 
 
 [2]
 No testimony was heard; both sides relied on affidavits and oral proffers. The affidavits consisted of those submitted by government agents in support of search warrants and orders for electronic surveillance, and those submitted by friends and relatives of Hurley
 
 
 [3]
 In March and April 1990, portions of the cash used to purchase checks were segregated at random and dog-tested for controlled substances. Each such test resulted in a positive alert
 
 
 [4]
 Saccoccia also wired large sums of money to the Trend account from Los Angeles and New York. In total, between January 1990 and April 1991, approximately $137 million was laundered through this central account. On April 2, 1991, the Providence bank closed Trend's account, and Saccoccia set up a new clearinghouse account in Los Angeles
 
 
 [5]
 For example, "ounces" meant thousands of dollars. "Karat" referred to the denomination of currency: e.g., twenty karat meant twenty dollars. "High grade" and "low grade" referred to high and low denomination currency, respectively
 
 
 [6]
 The district court downplayed the seriousness of this threat and did not base the detention order on the ground of dangerousness. The government has not argued in favor of detaining Hurley on this basis, either below or on appeal
 
 
 [7]
 Hurley also proffers (1) that the weapons found in his home (including the .44 magnum) were used for hunting, (2) that he brought the cash and gold home from the Saccoccia Coin Company because the security system had recently been tampered with, and (3) that the "we're fences" comment was nothing more than sarcasm
 
 
 [8]
 See, e.g., United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985) ("After hearing evidence, Congress concluded that 'flight to avoid prosecution is particularly high among persons charged with major drug offenses.' It found that 'drug traffickers often have established ties outside the UnitedStates ... [and] have both the resources and foreign contacts to escape to other countries ....' ") (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), reprinted in 1984 U.S.C.C.A.N. 3203) (citation omitted)
 
 
 [9]
 Exhibit A to the indictment lists hundreds of check purchases and, in each instance, identifies both the individual conducting the transaction and the business designated as "payee." Hurley's name, and that of the Saccoccia Coin Company, do not appear in this listing