**UNITED STATES of America**

v.

**Charles QUINTINA, etc., Alexander S. Rizzo, etc., Frederick W. Champa, etc., Pryce L. Quintina, etc.**

**Crim. No. 94–10027–WGY.**

United States District Court, D. Massachusetts.

March 7, 1994.

As Amended March 8, 1994.

---

Ernest S. Dinisco, Asst. U.S. Atty., Strike Force, Boston, MA, for U.S.

Richard Egbert, MaryEllen Kelleher, Law Office of Richard Egbert, Boston, MA, for defendant Charles Quintina.

Bernard Grossberg, Boston, MA, for defendant Alexander S. Rizzo.

Joseph J. Balliro, Jr., Frank Mondano, Balliro, Mondano & Balliro, Boston, MA, for defendant Frederick W. Champa.

Kevin S. Nixon, Boston, MA, for defendant Pryce L. Quintina.

*MEMORANDUM AND ORDER PURSUANT TO 18 U.S.C. § 3142(e) AFTER HEARING HELD PURSUANT TO 18 U.S.C. § 3142(f)*

COLLINGS, United States Magistrate Judge.

## I. INTRODUCTION

The defendants were arrested on February 2, 1994 on an indictment returned on February 1, 1994. At their initial appearances before me on February 2, 1994, the Government moved for a detention hearing pursuant to 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)(A) and (2)(B). The motion was allowed. The detention hearing was scheduled for, and in fact held, on February 3, 1994. Each defendant was represented by retained counsel who had entered an appearance for the detention hearing.

The issue for the Court is whether there are any condition or combination of conditions of release which will reasonably assure the appearances of the defendants and the safety of other persons and the community. Although I find that there are conditions which I could fashion which will reasonably assure the defendants' appearances, I find that the Government has demonstrated by clear and convincing evidence that there are no condition or combination of conditions which the defendants would obey which will reasonably assure the safety of other persons and the community. Put another way, I rely on the decision of the Court of Appeals in the case of *United States v. Tortora*, 922 F.2d 880 (1 Cir., 1990) and find that there is no reasonable assurance that the defendants would abide by conditions of release such as those so laboriously crafted by Judge Wolf in

the case of *United States v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass., 1990).

As the First Circuit has emphasized, "[d]etention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant." *United States v. Tortora, supra,* 922 F.2d at 888. Accordingly, the Court will first recite its findings with respect to each individual defendant.

## II. CHARLES QUINTINA

### A. Nature And Circumstances Of The Offenses Charged—18 U.S.C. § 3142(g)(1)

Charles Quintina is charged with thirty-one offenses, many of which are extremely serious and are crimes of violence as defined by 18 U.S.C. § 3156(a)(4).[1] In addition to the charges of a RICO conspiracy (Count 1) and a substantive RICO charge (Count 2), Charles Quintina is charged with eleven counts of extortion, that is, taking money with consent induced by "the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss." These offenses are alleged to have been committed between late 1986 through April of 1992. These offenses clearly meet the statutory definition of "crimes of violence." Next Charles Quintina is charged with five counts of conspiracy to use extortionate means to collect extensions of credit (Counts 18, 19, 22, 23 & 24), one count of participating the use of extortionate means to collect and attempt to collect extensions of credit (Count 20) and one count of making an extortionate extension of credit with the debtor understanding that "delay in making repayment and failure to make repayment could result in the use of violence to cause harm to the person, reputation and property of said debtor and others" (Count 21). These offenses were allegedly committed from late 1982 to August of 1992

and meet the statutory definitions of "crimes of violence."

In addition, Charles Quintina is charged with two counts of obstruction of justice (Counts 25 & 27), two counts of witness tampering (Counts 26 & 28), and one count of conspiracy to obstruct justice (Count 29). In Count 25, he is charged with endeavoring, through corrupt means, to influence and interfere with a Grand Jury witness in June and July, 1991 in violation of 18 U.S.C. § 1503. In Count 26, he is charged, also in June and July, 1991, with corruptly attempting to persuade the same witness not to testify before the Grand Jury in violation of 18 U.S.C. § 1512. In Count 27, he is charged with endeavoring, through corrupt means, to influence and interfere with a second Grand Jury witness in June and July, 1991 in violation of 18 U.S.C. § 1503. In Count 28, he is charged, also in June and July, 1991, with attempting to corruptly persuade the second witness not to testify before the Grand Jury in violation of 18 U.S.C. § 1512. Count 29 charges a conspiracy to do the acts charged in Counts 25, 26, 27 and 28. Counts 30 and 31 charge conspiracy to violate the Travel Act and a substantive violation of the Travel Act respectively. Lastly, he is charged with four counts of illegal gambling (Counts 3, 4, 5 & 6).

### B. Weight Of The Evidence—18 U.S.C. § 3142(g)(2)

The weight of the evidence appears quite strong. It is based in substantial part in electronic surveillance, oral and wire interceptions which were authorized by the Court. There is a strong likelihood of conviction. In fact, Charles Quintina and co-defendant Rizzo, in a conversation intercepted on April 9, 1991, speak of the tape of the October, 1989 induction ceremony, referred to *infra,* and how important the ruling on the motion to suppress the tape was ("It means a lot, that decision. Everybody. That goes for me,

1. Title 18 U.S.C. § 3156(a)(4)(A) defines a "crime of violence" as "an offense which has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another."

Title 18 U.S.C. § 3156(a)(4)(B) includes within the category of crimes of violence "any other

offense that is a felony and that, by its nature, involves a substantial risk that [physical force] against the person or property of another may be used in the course of committing the offense."

you, everybody.") and that if the judge "... knocks it down, it's better for us ... in particular." The tape was not suppressed in the litigation then pending.

### C. History And Characteristics Of The Person—18 U.S.C. § 3142(g)(3)

Charles Quintina is a seventy-seven year old lifelong resident of Revere, Massachusetts. He has lived most of his life at 83 Stanton Avenue, Revere, a home owned by his wife. He receives Social Security and has not been employed since 1978. In addition to his wife, his only blood relative is his nephew, co-defendant Pryce Quintina. He has had a heart condition and arthritis for twenty-five years. He has never abused drugs or alcohol and never been treated for any mental condition. He claims as his only financial asset a 1979 Plymouth Volare. His criminal record dates back to his late teenage years when he was convicted in the Worcester Superior Court with assault with intent to rob and armed robbery and received a 10–12 year prison sentence. In 1972 he was charged in this Court with illegal gambling but the charge was dismissed. He was not on release, probation or parole when any of the offenses with which he is now charged were committed.

### D. Nature And Seriousness Of The Danger To The Community That Would Be Posed By Release—18 U.S.C. § 3142(g)(4)

I find that Charles Quintina would pose a very serious danger to the community if released. While it is perhaps hard to imagine a seventy-seven year old man being dangerous, appearances can be deceiving. As noted, *supra*, most of the "crimes of violence" which he is charged with committing in the instant indictment occurred while he was in his seventies, the most recent (1992) occurring when he was seventy-five.

The evidence at the detention hearing establishes that Charles Quintina is a member of the New England Family of La Cosa Nostra. The family is headed by a boss, who is advised by a "consigliere" or counsellor who acts as advisor to the boss and other members of the family. Further down the organizational ladder are "capo regimes" who supervise "soldiers" who report to the "capo regime." In 1990, Charles Quintina was a "capo regime." The other three co-defendants were "soldiers" who worked under his direction and reported to him.

In late 1990, Charles Quintina became "consigliere" of the family and maintains that position today. Prior to that, he and the three co-defendants had attended a ceremony at which four new members were inducted into the family. Induction required adherence to the family's code of silence and sole allegiance to the family and other members of the family. The commitment was underlined by an oath to the effect that although one entering the family did so while alive, one did not leave the family alive but rather dead.[2] In addition, each new soldier was required to promise that he would kill any "rat" without hesitation if directed by his superiors to do so, even if the "rat" was his only brother or son.

The family's business in Massachusetts is illegal gambling, loansharking and extortion. The family will resort to murder and obstruction of justice to protect itself. It will also arrange to hide its members so that they can escape criminal prosecution. As noted, *supra*, Charles Quintina is charged with illegal gambling, loansharking, extortion and obstruction of justice in the instant case.

There is no evidence that Charles Quintina has in any respect altered his role in the family or ceased his illegal activities in connection with the family's business. If released, he would be a danger to the community. If released, there would be a substantial risk that he would attempt to obstruct justice.

### III. ALEXANDER RIZZO

### A. Nature And Circumstances Of The Offenses Charged—18 U.S.C. § 3142(g)(1)

Alexander Rizzo is charged with twenty-nine offenses, many of which are extremely serious and are crimes of violence as defined

---

**2.** "I want to enter alive into this organization and I will have to get out dead."

by 18 U.S.C. § 3156(a)(4).[3] In addition to the charges of a RICO conspiracy (Count 1) and a substantive RICO charge (Count 2), Alexander Rizzo is charged with ten counts of extortion, that is, taking money with consent induced by "the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss." These offenses are alleged to have been committed between late 1986 through April of 1992. These offenses clearly meet the statutory definition of "crimes of violence." Next Alexander Rizzo is charged with four counts of conspiracy to use extortionate means to collect extensions of credit (Counts 18, 19, 22 and 23), one count of participating in the use of extortionate means to collect and attempt to collect extensions of credit (Count 20) and one count with making an extortionate extension of credit with the debtor understanding that "delay in making repayment and failure to make repayment could result in the use of violence to cause harm to the person, reputation and property of said debtor and others" (Count 21). These offenses were allegedly committed from late 1982 to August of 1992 and meet the statutory definitions of "crimes of violence."

In addition, Alexander Rizzo is charged with two counts of obstruction of justice, two counts of witness tampering, and one count of conspiracy to obstruct justice. In Count 25, he is charged with endeavoring, through corrupt means, to influence and interfere with a Grand Jury witness in June and July, 1991 in violation of 18 U.S.C. § 1503. In Count 26, he is charged, also in June and July, 1991, with attempting to corruptly persuade the same witness not to testify before the Grand Jury in violation of 18 U.S.C. § 1512. In Count 27, he is charged with endeavoring, through corrupt means, to influence and interfere with a second Grand Jury witness in June and July, 1991 in violation of 18 U.S.C. § 1503. In Count 29, he is charged, also in June and July, 1991, with corruptly attempting to persuade the second witness not to testify before the Grand Jury in violation of 18 U.S.C. § 1512. Count 30 charges a conspiracy to do the acts charged in Counts 25, 26, 27 and 28. Counts 30 and 31 charge conspiracy to violate the Travel Act and a substantive violation of the Travel Act respectively. Lastly, he is charged with four counts of illegal gambling (Counts 3, 4, 5 & 6).

### B. Weight Of The Evidence—18 U.S.C. § 3142(g)(2)

The weight of the evidence appears quite strong. It is based in substantial part on electronic surveillance, oral and wire interceptions which were authorized by the Court. There is a strong likelihood of conviction. As indicated, *supra,* Alexander Rizzo and co-defendant Charles Quintina spoke on April 9, 1991 of the strength of the evidence against them in the form of the October, 1989 tape of the induction ceremony they attended.

### C. History And Characteristics Of The Person—18 U.S.C. § 3142(g)(3)

Alexander Rizzo is a seventy-nine year old lifelong resident of Revere, Massachusetts. He has lived for the past thirty-five years at 81 High Street, Revere, a home owned by his wife. He receives Social Security and has not been employed since 1962. In addition to his wife, his only blood relatives are his son and two children who live in Revere. He has had a prostate condition, gallbladder problems, skin cancer and arthritis. He has never abused drugs or alcohol and never been treated for any mental condition. He claims as his only financial asset a 1975 Cadillac. His criminal record dates back to his teenage years when he was convicted of breaking and entering on three occasions. When he was twenty, he was convicted of armed robbery. In his thirties, he was convicted of assault and battery and carrying a concealed weapon. He has never defaulted in court.

### D. Nature And Seriousness Of The Danger To The Community That Would Be Posed By Release—18 U.S.C. § 3142(g)(4)

I find that Alexander Rizzo would pose a very serious danger to the community if released, for essentially the same reasons I

---

3. *See* footnote 1 for the applicable definition of a "crime of violence."

found Charles Quintina to be a danger. I note that most of the "crimes of violence" which he is charged with committing in the instant indictment occurred while he was in his seventies, the most recent (1992) occurring when he was seventy-seven.

The evidence at the detention hearing establishes that Alexander Rizzo is also a member of the New England Family of La Cosa Nostra. He is a "soldier" who reported to his "capo regime" co-defendant Charles Quintina when he was "capo regime." He attended the induction ceremony in October, 1989 and became the "compare" (brother for life) of one of the new inductees.

As with co-defendant Quintina, there is no evidence that Alexander Rizzo has in any respect altered his role in the family or ceased his illegal activities in connection with the family's business. If released, he would be a danger to the community. If released, there would be a substantial risk that he would attempt to obstruct justice.

## IV. PRYCE QUINTINA

### A. Nature And Circumstances Of The Offenses Charged—18 U.S.C. § 3142(g)(1)

Pryce Quintina, nephew of co-defendant Charles Quintina, is charged with ten offenses, many of which are extremely serious and are crimes of violence as defined by 18 U.S.C. § 3156(a)(4).[4] In addition to the charges of a RICO conspiracy (Count 1) and a substantive RICO charge (Count 2), Pryce Quintina is charged with four counts of extortion[5], that is, taking money with consent induced by "the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss." These offenses are alleged to have been committed between 1982 and April, 1992. These offenses clearly meet the statutory definition of "crimes of violence." Next Pryce Quintina is charged with one count of conspiracy to use extortionate means to collect extensions of credit (Count 24). This offense was allegedly committed from in or about December, 1991, a

little over two years ago and meets the statutory definition of a "crime of violence." In addition, Pryce Quintina is charged in Counts 30 and 31 with conspiracy to violate the Travel Act and a substantive violation of the Travel Act respectively. Lastly, in Count 6 he is charged with illegal gambling.

### B. Weight Of The Evidence—18 U.S.C. § 3142(g)(2)

The weight of the evidence appears quite strong. It is based in substantial part on electronic surveillance, oral and wire interceptions which were authorized by the Court. There is a strong likelihood of conviction.

### C. History And Characteristics Of The Person—18 U.S.C. § 3142(g)(3)

Pryce Quintina is a fifty-four year old lifelong resident of Massachusetts who has, for the past seven years, rented the premises at 450 Malden Road, Revere. He owns no real property. He is unemployed and has not been employed in 10 years. He has a sister in Revere and five children from two marriages, both of which ended in divorce. One child lives in Carver, two in Revere, and the two youngest, ages 14 and 12, live in New Hampshire. None of the children reside with him. He resides with his girlfriend and her daughter, presumably from a previous relationship.

Pryce Quintina has no health problems and has never abused drugs or alcohol and never been treated for any mental condition. He refuses to reveal any information as to his financial condition. His only prior conviction was on a charge of conspiracy to commit an assault in Concord, New Hampshire in 1967; he was found guilty and the case was placed on file.

### D. Nature And Seriousness Of The Danger To The Community That Would Be Posed By Release—18 U.S.C. § 3142(g)(4)

I find that Pryce Quintina would pose a very serious danger to the community if re-

---

4. See footnote 1 for the applicable definition of a "crime of violence."

5. Counts 7, 15, 16 & 17.

leased, for essentially the same reasons I found Charles Quintina to be a danger.

The evidence at the detention hearing establishes that Pryce Quintina is also a member of the New England Family of La Cosa Nostra. He is a "soldier" who reported to his "capo regime" co-defendant Charles Quintina when he was "capo regime." He attended the induction ceremony in October, 1989.

As with the co-defendants Charles Quintina and Alexander Rizzo, there is no evidence that Pryce Quintina has in any respect altered his role in the family or ceased his illegal activities in connection with the family's business. If released, he would be a danger to the community. During conversations with co-defendant Rizzo captured on electronic surveillance, Pryce Quintina is quoted as saying "we gotta rob somebody" and, in order to get someone to pay money owed, he states "You gotta shake him up—let me bounce him off the f------ wall." At another time, he talks about a recalcitrant debtor and says "we gotta get someone to shake him up now ... someone to go and grab him."

## V. FREDERICK CHAMPA

### A. Nature And Circumstances Of The Offenses Charged—18 U.S.C. § 3142(g)(1)

Frederick Champa is charged with twelve offenses, many of which are extremely serious and are crimes of violence as defined by 18 U.S.C. § 3156(a)(4).[6] In addition to the charges of a RICO conspiracy (Count 1) and a substantive RICO charge (Count 2), Frederick Champa is charged with five counts of extortion,[7] that is, taking money with consent induced by "the wrongful use of actual and threatened force, violence, and fear including indirect threats of physical harm, property damage, and economic loss." These offenses are alleged to have been committed between late 1986 through April of 1992. These offenses clearly meet the statutory definition of "crimes of violence." Next Frederick Champa is charged with one count of conspiracy to use extortionate means to collect extensions of credit (Count 23). This offense was allegedly committed in the time period April–June, 1991 and meets the statutory definitions of a "crime of violence." Frederick Champa is also charged in Counts 30 and 31 with conspiracy to violate the Travel Act and a substantive violation of the Travel Act respectively. Lastly, Frederick Champa is charged with one count of illegal gambling (Count 6).

### B. Weight Of The Evidence—18 U.S.C. § 3142(g)(2)

The weight of the evidence appears quite strong. It is based in substantial part on electronic surveillance, oral and wire interceptions which were authorized by the Court. There is a strong likelihood of conviction. Speaking of the tape of the October, 1989 induction ceremony on July 20, 1991, Frederick Champa says that "... if they find Nicky guilty we ain't got a chance. You know that? No f------ chance with that tape. That tape."

### C. History And Characteristics Of The Person 18 U.S.C. § 3142(g)(3)

Frederick Champa is a seventy-two year old of Saugus, Massachusetts where he has lived in a home he owns for the past thirty-five years. He was born in Italy and came to this country at age 18 and was subsequently naturalized. He served with distinction in the Army from 1941 to 1945 receiving a bronze star with oak leaf cluster. He has a brother in Medford and two brothers who reside in Maine. He is married with no children. He receives Social Security and has not been employed since 1988. For twenty-five years prior to that he ran a discount store in Revere. He has considerable financial assets including a $25,000.00 IRA and $35,000.00 in a "store checking account." He owns real estate in Revere worth $500,-000.00. He has had the following conditions: diabetes, asthma, hypertension, gout, stenosis of the spine and cataracts. He has never abused drugs or alcohol and never been treated for any mental condition. His crimi-

---

**6.** *See* footnote 1 for the applicable definition of a "crime of violence."

**7.** Counts 7, 13, 15, 16 & 17.

nal record dates back to 1952 when he was charged and convicted of larceny of an automobile and received a 4–5 year sentence.

### D. Nature And Seriousness Of The Danger To The Community That Would Be Posed By Release—18 U.S.C. § 3142(g)(4)

I find that Frederick Champa would pose a very serious danger to the community if released, for essentially the same reasons I found Charles Quintina, Alexander Rizzo and Pryce Quintina to be dangers to the community. I note that most of the "crimes of violence" which he is charged with committing in the instant indictment occurred while he was in his late sixties.

The evidence at the detention hearing establishes that Frederick Champa is also a member of the New England Family of La Cosa Nostra. He was a "soldier" who reported to his "capo regime" co-defendant Charles Quintina when he was "capo regime." However, he now has assumed the role of a "capo regime" himself. He attended the induction ceremony in October, 1989.

As with the other co-defendants, there is no evidence that Frederick Champa has in any respect altered his role in the family or ceased his illegal activities in connection with the family's business. If released, he would be a danger to the community.

### VI. ARE THERE CONDITIONS OF RELEASE WHICH THE DEFENDANTS WILL OBEY WHICH WILL REASONABLY ASSURE THE SAFETY OF THE COMMUNITY?

Finding that the defendants would pose a danger to the community if released, a finding I have made as to each of the four defendants, does not end the inquiry. I have to determine whether there are any conditions of release which the defendants would obey which would reasonably assure the safety of other persons and the community. The question has two parts. The first is whether there are any conditions of release which would reasonably assure the safety of the community. The answer to that question is plainly "yes." Conditions of release such as those set by Judge Wolf in *United States v. DiGiacomo, supra,* 746 F.Supp. at 1190–99 would reasonably assure the safety of other persons and the community if there were any reasonable assurance that the defendants would abide by them. However, as to each of the defendants before me, I find that there is no reasonable assurance that any of the defendants would abide by those conditions of release if I set them. In other words, I am unable to find, as Judge Wolf did in the *DiGiacomo* case, that the defendants would likely satisfy their legal obligations, such as release conditions. In fact, I find the opposite—that there is no reasonable assurance that they would. Accordingly, each of the defendants shall be detained pending trial.

I make this finding based on what I perceive to be clear and convincing evidence. First, as sworn members of the family, the defendants have sworn to give ultimate allegiance to the family and to do anything required, including murder, to advance the family's interests. The "anything required" would clearly encompass the violation of conditions of release. As Judge Selya wrote in the *Tortora* decision:

> . . . [The defendant] argues that federal courts may not consider associational ties as a factor in measuring a person's likely dangerousness. We find this asseveration specious. [The defendant's] association with a criminal cabal, his membership in a Family, and his avowals to further the Family's goals through illicit activity are highly relevant considerations under 18 U.S.C. § 3142(g). [The defendant] is being judged, as he should be, as an individual, with one relevant characteristic being his devotion to the Mafia and his pledge to violate the law whenever necessary to further its end.

*United States v. Tortora, supra,* 922 F.2d at 885, footnote 6.

Second, there is concrete evidence in this case which indicates that the defendants, as family members, have no compunction to disregard or scheme to evade conditions of release. On May 4, 1991, while Mr. DiGiacomo was out of jail on Judge Wolf's release conditions, defendants Charles Quintina and Frederick Champa conversed on the telephone about the necessity of meeting with Mr. DiGiacomo even though such a visit would violate Judge Wolf's order setting conditions of release on Mr. DiGiacomo. On the same date, Charles Quintina discussed the pro-

posed visit to Mr. DiGiacomo with Alexander Rizzo. It was clear that all three were planning to meet Mr. DiGiacomo, a visit which had to be done in the dark to avoid detection. What is obvious is that as to these three defendants, the obligation to the family supersedes any obligations to obey conditions of release set by the Court.[8]

The words of the First Circuit in this respect are prescient:

> Consequently, we find that the [suggested] conditions of release as a whole are flawed in that their success depends largely on the defendant's good faith—or lack of it. They can be too easily circumvented or manipulated. Such a flaw takes on great significance when, as in this case, little about the defendant or his history suggests that good faith will be forthcoming. If past is prologue, the promises to hew the straight and narrow will mean next to nothing to this defendant. In our estimation, the conditions fail to offer an objectively reasonable assurance of safety to the community.

*United States v. Tortora, supra,* 922 F.2d at 887. The words are equally applicable here. The facts of this case demonstrate, in my opinion, that any action to set conditions of release in order to be solicitous of the defendants' ages or medical conditions, however well-intentioned, would be misguided and the result of putting on "rose-colored glasses." Through clear glasses, the reality could not be more striking—these defendants, if released, would pose a danger to the community.

## VII. CONCLUSION AND ORDER

Accordingly, pursuant to 18 U.S.C. § 3142(e), it is ORDERED that the defendants be, and they hereby are, DETAINED pending trial of the charge contained in the above-styled Indictment. Pursuant to 18 U.S.C. § 3142(e), the written findings of fact and a written statement of reasons for the detention are contained *supra.* Further pursuant to 18 U.S.C. § 3142(i), it is ORDERED that:

(1) The defendants be, and he hereby are, committed to the custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

(2) The defendants be afforded reasonable opportunity for private consultation with their counsel; and

(3) On Order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendants are confined deliver the defendants to an authorized Deputy U.S. Marshal for the purpose of any appearance in connection with a court proceeding.

## VII. REVIEW BY THE DISTRICT JUDGE

Review of the within Detention Order may be had by the defendants filing a motion for revocation or amendment of the within Order pursuant to 18 U.S.C. § 3145(b).

---

**8.** While there is no evidence that Pryce Quintina schemed to disobey the order setting conditions of release for Mr. DiGiacomo, I rely on the entire record, including his membership in the family, in reaching my conclusion.