**UNITED STATES of America, Plaintiff,**

**v.**

**Larry GRAY, Defendant.**

**Crim. No. 86–50016–01.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Jan. 15, 1987.

---

J. Michael Fitzhugh, U.S. Atty., Fort Smith, Ark., for plaintiff.

Michael R. Salamo, White and Salamo, Fayetteville, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

On October 29, 1986, the grand jury for the United States District Court, Western District of Arkansas, returned a twelve-count indictment charging defendant, Larry Gray, and several other persons with a number of offenses against the United States resulting from the alleged attempt by Gray to have others murder Norman Douglas Norwood, a person believed by him to be having an affair with Gray's wife. His former wife is now divorced from him and is married to Norwood.

Gray is charged in nine of the twelve counts of the indictment and, if found guilty, could be fined a total of $110,000.00, and could be imprisoned for a total of 80 years.

Gray was initially charged in the Circuit Court of Washington County, Arkansas, with conspiracy to commit capital murder by information filed by the Prosecuting Attorney on January 21, 1986, and was arrested on those charges and arraigned on January 28, 1986. At the arraignment, his bond was set at $250,000.00, and he posted the bond through a corporate surety. Because of the insolvency of the corporate surety, by order dated May 6, 1986, the initial bond was declared invalid and defendant was required to post a new corporate surety bond, apparently secured, at least in part, by a mortgage on his mother's farm. It appears that at least for some period between the time that the initial bondsman became insolvent and the posting of the new bond, Gray remained

free with, in effect, no bond being posted. It appears to be undisputed that, during the period of time that he was free on bond while state charges were pending, he timely appeared for all court hearings.

On October 31, 1986, two days after the federal indictment was returned, the state charges against Gray were dismissed by the Prosecuting Attorney's motion for "nolle prosequi." Immediately after Gray was informed that the state charges had been dismissed and that the federal indictment had been returned, he turned himself in to authorities. Apparently the next day after his arraignment, a detention hearing was held before the Magistrate for the United States District Court, Northern District of Oklahoma, and that court found that there was a serious risk that the defendant would flee or that he would obstruct or attempt to obstruct justice or threaten, injure, or intimidate a prospective witness. That court ordered the detention of the defendant prior to trial.

On December 30, 1986, defendant's court-appointed attorney moved for the revocation of or amendment of the detention order issued by the Magistrate in Oklahoma. An evidentiary hearing was held on that motion on January 9, 1987. At that hearing, the government called John Herring, an officer with the University of Arkansas Department of Public Safety, the agency which made the arrest of an alleged co-conspirator, Michael Jackson, which in effect started the proceedings that resulted in these charges.

Because the relevant statute, 18 U.S.C. § 3142(g), provides that one of the matters which a court shall consider in determining whether there are conditions of release that will reasonably assure the appearance of the person and the safety of any other person in the community is "the weight of the evidence against the person," the court allowed the government to show through Mr. Herring a great deal of the evidence which the government has against him. Admittedly, much if not most of Officer Herring's testimony would have been excluded as hearsay if the matter was being tried on the merits, but such hearsay testimony was admissible at this hearing because of the provisions of 18 U.S.C. § 3142(f) which provides that: "The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."

The court will preface what it has to say about the "evidence" elicited from Mr. Herring with the admonition that no person should assume from what the court has to say that it has formed any opinion about the guilt or innocence of Mr. Gray. 18 U.S.C. § 3142 says "nothing in this section shall be construed as modifying or limiting the presumption of innocence." Under our system, all accused are presumed to be innocent until the government proves to a jury of twelve persons, beyond a reasonable doubt, that he is guilty. Our system simply will not work if jurors or prospective jurors from what they "hear or read" allow that presumption to be eroded to the slightest degree.

With that being said, the court must conclude that, in the event that the government can prove by admissible evidence the "facts" which Mr. Herring testified to, the weight of the evidence is "heavy." Herring's testimony indicates that the government has evidence which indicates that in approximately August of 1985, Gray contacted a person in Florida named Geer about killing Norwood while he was on a trip to Florida in a vehicle loaned to him by Gray. It is claimed that the government has an audio tape recording of the conversation between Geer and Gray in which these arrangements were made.

Herring claims that the government has evidence which indicates that, also in August of 1985, Gray contacted an alleged co-conspirator, also a defendant in the case, Richard Savage, in response to an advertisement placed in Soldier of Fortune magazine by Mr. Savage. The evidence indicates that on or about August 29, 1985, Savage and other co-conspirators and defendants in the case, William Buckley, Dean Deluca and Debra Mattingly, trav-

eled to Fayetteville, Arkansas, with the purpose of killing Norwood. Herring says that the government has evidence consisting of telephone records showing that, after arriving in Fayetteville, these individuals called Gray because they couldn't find Norwood's apartment. It is claimed that after his apartment was located, Deluca and Buckley shot and injured Norwood. Buckley and Mattingly have pled guilty to certain charges made against them, and in interviews conducted, have admitted their involvement and have inculpated Gray.

According to Herring, the government also has evidence consisting of interviews with a person named Montgomery who allegedly went to Tulsa to see Gray after Montgomery was contacted by Gray as a result of another Soldier of Fortune advertisement. Montgomery has told authorities that Gray said he wanted Norwood "shot in the head." Montgomery declined the offered engagement after he learned of the prior attempt on Norwood's life, believing that it was too risky.

Michael Jackson, a co-conspirator, not indicted in this indictment (but charged in other jurisdictions), is cooperating with authorities and claims that he was contacted by Gray and told that he wanted Norwood dead. Jackson made a tape recording of his conversation with Gray concerning the placing of three hand grenades (called softballs in the discussion) under Norwood's car while parked at the University of Arkansas. Jackson made and turned over to authorities an audio tape of this conversation. The evidence shows that, in fact, one or more hand grenades were placed under Norwood's car, and one or more of them exploded, but did not substantially injure Norwood.

Another matter which 18 U.S.C. § 3142(g) directs that a court will consider in determining the conditions of release is the history and characteristics of the person including, *inter alia,* his past conduct. In this respect, the government elicited from Officer Herring testimony that Gray's first wife had said that, after her divorce from him in 1978, a man that she was dating was assaulted by two men while leaving a bar. She allegedly said that Gray told her that he had hired these individuals to do the act, and that he would deal similarly with other persons that she dated if he did not approve of them. Because of the passage of time and the hearsay nature of this testimony and other factors, the court will decline to place any credence in that testimony.

Likewise, on the question of whether the defendant is likely to flee, the government had Herring testify that Kathy Norwood (the person who had been his wife at the time of the alleged incidents), says that during a conversation with Gray she told him that it appeared that he was in serious trouble and that he faced a very lengthy sentence. She claims that he responded that she should not worry about him because he had contacted a plastic surgeon (apparently to alter his appearance in the event that he needed to flee), and showed her a list of six individuals that he claimed were committed to help him if necessary. Again, because of the rank hearsay nature of this testimony (the government could have called Kathy Norwood to the stand if they desired), and because of the circumstances of their parting, the court will give no weight to this evidence.

Similarly, on the question of whether his release would pose a danger to other persons in the community, Herring says that Montgomery claims that he was contacted and threatened by one or more persons prior to his testimony before the grand jury, and that there was at least a claim by a bail bondsman in Oklahoma that Gray had contacted him about harming witnesses. Again, the court simply believes that that testimony was not sufficiently substantiated to be given much consideration in determining whether a fellow human being, presumed to be innocent, should be required to remain in jail pending trial. After all, the mere fact that Montgomery admits that he discussed killing another and declined the job only because he decided it was too risky may indicate that he is not a "choir boy." In any event, the evi-

dence does not indicate that Montgomery says that Gray was responsible for the alleged threats, although that inference could obviously be made and the government obviously hopes that it will be.

■ The law clearly is that a defendant can be detained prior to trial only if the government shows by clear and convincing evidence that no release condition or set of conditions will reasonably assure the safety of the community or, by a preponderance of the evidence, that no condition or set of conditions will reasonably assure the defendant's appearance at trial. *United States v. Orta*, 760 F.2d 887 (8th Cir.1985); 18 U.S.C. § 3142(f).

■ The court will first consider what it believes to be the easier of these two questions—has the government proved by a preponderance of the evidence that no release condition or set of conditions will reasonably assure the defendant's appearance at trial. What has the government "proved" in this respect? The only evidence that it offered on this subject was Herring's hearsay statement that Gray's ex-wife, now married to the man that he is charged with attempting to kill, has said that Gray told her that he had contacted a plastic surgeon, apparently to change his appearance if he desired to flee, and that he showed her a list of persons who would help him. The court recognizes that the law is that hearsay may be received and relied on in hearings such as this one, but the court is willing to go only so far in deciding the issues on nothing more than hearsay. All that we have is that Herring says that Kathy Norwood would testify as he says she would, but the fact is that she didn't and was not subject to cross-examination. The court simply is not willing to hold that the government has met its burden of proving by a preponderance of the evidence that no condition or set of conditions will reasonably assure the defendant's appearance at trial based strictly on the hearsay statement of Kathy Norwood, especially in light of her prior and present relationship with Gray and the man that he is accused of attempting to kill, Norwood.

■ Other than these hearsay statements, there is no evidence which directly indicates that Gray is likely to flee. It is true that, as the court has already indicated, the evidence indicating his guilt appears, based on what was elicited at this hearing, to be strong. However, the court does not believe that it can assume or that any court should presume that every person charged is likely to flee simply because the evidence against him appears to be weighty. If that were the case, the court can think of few instances where a person would be allowed to remain free pending trial. Such a presumption would appear to be tantamount to a presumption of guilt, a presumption that our system simply does not allow.

■ Not only did the government fail, in the court's view, to prove by a preponderance of the evidence that Gray, if freed, is likely to flee, the undisputed evidence is that he has much going for him in this respect. As indicated above, after his arrest by state authorities he was charged with the very serious crime of conspiring to commit capital murder. In spite of the seriousness of these charges, state authorities released him at the end of January, 1986, when he posted the required $250,-000.00 bond. It is clear that he remained free from that date until he turned himself in to federal authorities in October of 1986 and that he, during that period, made all required court appearances and complied with all other conditions of release. This is true in spite of the fact that the evidence shows that, because of the insolvency of the first bondsman, he was free for a period of time with no bond posted. At the time that the state charges were dismissed and the federal charges were instituted, he apparently was right where he was expected to be and, when notified that the state charges had been dismissed and that the federal charges had been filed, turned himself in.

The provisions of 18 U.S.C. § 3142(g) direct that courts, among other things, take into consideration when considering mat-

ters such as this one the accused's family ties, employment, and record concerning appearance at court proceedings. The court has already discussed defendant's record concerning appearance at court proceedings and it should be noted that this record was made during a period of time when Gray had knowledge of much of the strong evidence against him. During the course of the hearing, the court directed that the U.S. Attorney determine and disclose to the court when Gray was made aware by state authorities during discovery proceedings of the extent and nature of the evidence against him. It was determined that that date was July 9, 1986. Thus, for more than three months after he knew the strength of the state's case and was aware that authorities had tape recordings of him allegedly talking to co-conspirators about the crime, he was still "around" when the federal charges were filed, and he made himself available at that time, and willingly allowed himself to be transferred to Arkansas by federal authorities.

As to employment history and family ties, the evidence indicates that, prior to his arrest, he had a successful loan brokerage business in Tulsa. Since his divorce from the woman who is now Mrs. Norwood, he has remarried and his wife is expecting a child in the near future.

For the reasons discussed above, the court simply does not believe that the government has proved by a preponderance of the evidence that there are no conditions of release which would reasonably assure Gray's appearance at the trial to be held in this matter, and, to the contrary, the evidence and Gray's prior actions indicate otherwise.

■ The question of whether there are any release conditions which the court could impose which will reasonably assure the safety of any other person and the community is a much more difficult one. The Court of Appeals for the Eighth Circuit in *United States v. Orta, supra,* held that the words "reasonably assure" do not mean "guarantee." The court said: "The judicial officer cannot require more than an

objectively reasonable assurance of community safety and defendant's appearance at trial." *United States v. Orta, supra,* at 892. *See also* the court's discussion in footnote 14 of that opinion about the difference between the legal standards set forth in subsection (b) and that found in subsections (c), (e), (f) and (g). The court concludes that the difference between those standards

... reemphasizes congressional intent to preserve the statutory bias favoring pretrial release for most defendants. Subsection (b) directs release unless release "will not reasonably assure" the defendant's appearance or "will endanger" the community's safety. 18 U.S.C. § 3142(b). Although the judicial officer may impose further restrictions upon a finding that the legal standard for either the flight or the danger concerned is not met, a determination of the defendant's release "will endanger" the community will be rare.

The court said that:

The judicial officer must also consider whether one of the codified conditions or any combination of the conditions will "reasonably assure" the defendant's appearance and the safety of the community. The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention.

760 F.2d at 890–91.

If the court of appeals is correct (and, under our system, this court must presume that it is), not only did Congress intend that very few persons would be held in prison pending trial, Congress specifically made more difficult the government's burden of proof necessary to show that an accused should be held in jail pending trial. 18 U.S.C. § 3142(f) provides:

The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by *clear and convincing* evidence. (emphasis supplied).

While Congress must have known what it meant when it used the term "clear and convincing evidence" and probably believed that judges and lawyers would certainly know, it is not at all clear from a perusal of treatises and case law that any universal definition has evolved. 30 Am.Jur.2d *Evidence* § 1167 attempts to define this term as follows:

> Other combinations of terms are frequently used to indicate the same degree of proof as clear and convincing, such as "clear, cogent, and convincing"; "clear, satisfactory, and convincing"; "clear, unequivocal, and convincing"; "clear, precise, and indubitable"; "explicit and convincing"; "clear, distinct, and irresistible"; "clear, unequivocal, and definite"; "plain and convincing beyond reasonable controversy"; or "clearest and most satisfactory." Again, the courts have required the evidence to be "clear," "full and clear," "convincing," "conclusive," "cogent," "strong," "unequivocal," and "positive, unequivocal, and inconsistent with the contract." (citing cases).

Black's Law Dictionary 227 (5th ed. 1979) defines "clear and convincing proof" as follows:

> **Clear and convincing proof.** Generally, this phrase and its numerous variations mean proof beyond a reasonable, *i.e.*, a well-founded doubt. Some cases give a less rigorous, but somewhat uncertain, meaning, *viz.*, more than a preponderance but less than is required in a criminal case.
>
> Proof which should leave no reasonable doubt in the mind of the trier of the facts concerning the truth of the matters in issue. *In Interest of Jones,* 34 Ill. App.3d 603, 340 N.E.2d 269, 274 [1975].
>
> That measure or degree of proof which will produce in mind of trier of facts a firm belief or conviction as to allegations sought to be established; it is intermediate, being more than mere preponderance, but not to extent of such certainty as is required beyond reasonable doubt as in criminal cases. *Fred C. Walker*

*Agency, Inc. v. Lucas,* 215 Va. 535, 211 S.E.2d 88, 92 [1975].

Be that as it may, and irrespective of the exact definition of this term that is to be used in applying the law written by Congress, it is clear that Congress must have intended that something more than a preponderance of the evidence (the greater weight of the evidence) be shown before an accused, presumed innocent, can be held in jail until he is tried. Perhaps it is not necessary that the judge be "plumb sure" that no set of release conditions will protect the public, but he ought to be "pretty sure."

■ In this case, this court is simply not sufficiently convinced that this is the case. Again, the irrefutable facts indicate that Mr. Gray was released in late January of 1986 and that he remained free until late October of 1986. There was no indication at the hearing in this matter that any special protective measures were taken but, in spite of this, there was absolutely no credible evidence adduced at the hearing which indicates that Mr. Gray, during the several months that he was free, harmed or attempted to harm any other individual. All the important witnesses, with the exception of Mr. Norwood, who can be expected to testify against Gray in relation to the charges against him are in either federal or state custody. Thus, they would not appear to be in substantial danger, at least not from Mr. Gray or his associates. Based on the evidence at the hearing, it appears that these persons in custody are the witnesses who can give especially damning evidence against Gray, so it does not appear that he would have any incentive to harm the only witness that he might be able to reach during his release. The court does not gather from the file developed in this case and the evidence at the hearing that Gray is a "stupid" individual. In fact the evidence indicates that he is intelligent and articulate. It would not be "smart" for him to do harm to Norwood since that would only amplify exponentially his problems. In view of the strong evidence in the hands of authorities and the

knowledge of cooperating witnesses in custody, Gray should "hope and pray" that nothing happens to Norwood prior to the trial. The witnesses in custody would still be there to testify, and the government would still have the incriminating audio tapes which two of these individuals made. Harm of Norwood would change nothing except the severity of the charges.

Again, Gray's past conduct in this respect is illuminating. There was no evidence that, during the several months that he was free after posting the bond required by the state court, Norwood was harassed, intimidated, threatened, or harmed in any way by Gray. The court is convinced that if there had been such evidence, the authorities and this court would have known about it. If he did not harm or threaten harm to Norwood or any other member of the public during that period of time, what reason does this court have to now believe that circumstances have changed to the extent that he now is a danger to an individual in the community or the community as a whole if he is released, or, at least, what evidence is there in this respect that is of a clear and convincing nature?

The court in *United States v. Maull*, 773 F.2d 1479 (8th Cir.1985), directed that trial courts, in ruling on matters such as this one, progress step by step through the conditions set forth in 18 U.S.C. § 3142. In doing this, the court concludes that release on his personal recognizance or an unsecured appearance bond "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." Since that is the case, 18 U.S.C. § 3142(c) commands that this court order the pretrial release of the accused "subject to the least restrictive further condition, or combination of conditions, that he determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." Applying the law in this respect the court concludes that the defendant will be released subject to the following conditions:

(a) that he either post bail in cash or execute a bail bond with a solvent corporate surety in the amount of $250,-000.00, guaranteeing his appearance and compliance with the conditions of release;

(b) that he not travel out of the Western District of Arkansas or the Northern District of Oklahoma without the specific written authorization of this court;

(c) that he avoid all contact with the alleged victim of the crime and with any potential witnesses who may testify concerning the offense;

(d) that he refrain from possessing firearms, destructive devices, or other dangerous weapons;

(e) that he daily report his activities by telephone to the probation officer or pretrial services officer to which he is assigned, with such report to be not earlier than 1:00 p.m. and not later than 5:00 p.m. of each day. He shall report in person to such probation officer or pretrial services officer at least weekly at the time and place designated by such officer.

A pretrial release order with such provisions shall be entered contemporaneously herewith.