## UNITED STATES

v.

## Fillisangelo SILVA

## No. Crim MJ01–M–201 JLA.

United States District Court,
D. Massachusetts.

March 9, 2001.

James Lang, United States Attorney's Office, Boston, MA, for U.S.

### MEMORANDUM AND ORDER ON DETENTION

ALEXANDER, United States Magistrate Judge.

The defendant, Fillisangelo Silva ("Mr. Silva"), appeared before this Court on February 5, 2001, for an initial appearance pursuant to a complaint charging him with violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm). On February 8, 2001, the defendant returned to court for a probable cause and detention hearing. At the hearing, Assistant United States Attorney James F. Lang represented the government and Attorney Tamar Birckhead of the Federal Defenders represented the defendant. The government moved

for detention pursuant to 18 U.S.C. § 3142(f)(1)(A) (the crime charged is a crime of violence), (f)(1)(D) (criminal recidivism), and (f)(2)(A) (risk of flight). The Court now finds that there is no condition or set of conditions that would assure the defendant's appearance at trial and therefore orders that the defendant be DETAINED. As set forth below, although the Court has no doubt that Mr. Silva poses a threat to the community, the Court is restrained by law from detaining him on the dangerousness grounds proffered by the government because Mr. Silva is not charged with a crime of violence and because the Court cannot find that the defendant's criminal record qualifies as a predicate for recidivism unless his juvenile adjudications are considered.

The following recounts the hearing and the evidence presented in support of probable cause and for detention.

In support of its motion for detention and in order to establish probable cause, the government offered the credible testimony of Mark DeSantis, a special agent with the U.S. Treasury's Department of Alcohol, Tobacco and Firearms ("ATF"). In addition, the government offered the affidavit of Agent DeSantis, the defendant's criminal record, and various incident, arrest, and investigative reports from the Boston Police Department and the Brockton Police Department. The evidence presented at the hearing can be categorized according to three separate (but possibly related) incidents. The second incident is directly applicable to the instant case.

### 1. The March 5, 2000 shooting in Brockton, Massachusetts.

Agent DeSantis recounted an incident involving the defendant that occurred in Brockton on March 5, 2000. That day, Brockton Police Department officers working undercover were called to respond to a large fight at a local convenience store.

Soon after their arrival, a man subsequently identified as Mr. Silva began firing a gun in the vicinity of the police and the crowd outside the convenience store. The volley of bullets stopped momentarily before renewing. By the time the assault concluded, one bystander was wounded and nearby homes were peppered with bullets.

Mr. Silva then fled by motor vehicle which, although driven by another, further endangered the public by erratic driving. His efforts to escape were unsuccessful; the vehicle was stopped and he was apprehended. Although no weapons were found on his person, at the scene officers found a Glock .40 caliber pistol with a laser sighting device that had been reported stolen previously by a police officer in a neighboring town. Mr. Silva was charged in state court with three counts of assault with intent to murder, assault and battery with a dangerous weapon, and other offenses, and was released.

Soon after the incident, police received another call for assistance. This time, they responded to the defendant's residence to find that several shots from a nine millimeter pistol had been fired into the defendant's home where he lived with his family. That family includes his mother and siblings, one of whom the Pretrial Services Office ("PSO") for the Court reports is only eleven years old.

### 2. The November 19, 2000 shooting incident in Boston, Massachusetts.

Agent DeSantis testified that several months later, on November 19, 2000, Boston Police Department officers were dispatched to a gas station in the Dorchester neighborhood of Boston following an emergency report of gun shots being fired. Soon after arriving, the responding officers located a gun, a Davis Industries .380 caliber pistol bearing serial number AP058907,[1] near a fence diagonally across

---

**1.** Agent DeSantis informed the Court that the firearm was not manufactured in the Com-

monwealth and *a fortiori* must have traveled

from the gas station. In addition, the officers found ten spent shell casings in the parking lot of the gas station.

Contemporaneously, another Boston police officer noticed two men in a motor vehicle observing the responding officer's work at the gas station. The officer positioned his cruiser behind the men's vehicle which bore Massachusetts license plates and the Massachusetts registration number "1810PL." When the men noticed the cruiser, they pulled their vehicle into a parking lot and stopped. As the officer passed them, he saw the passenger get out the vehicle and then exchange clothing with his driver. The officer then proceeded to the gas station where he joined in the other officers' efforts. Those efforts included the interview of a witness to the incident (ostensibly the witness who notified police via her call for assistance).

The witness described that a heavy set African–American male, traveling on foot, fired shots at a dark-colored car in the gas station. The shooter then fled on foot, dropping the gun near the fence before jumping into a waiting motor vehicle. The witness was able to provide a partial identification of the license plates on the vehicle, which bore the number "1810." The witness further described that she had seen the vehicle pull into a nearby parking lot and that the passenger in the vehicle changed shirts with the vehicle's driver. The police, now realizing the connection between the shooting incident and the suspicious behavior of the men in the dark-colored vehicle, began to search for the vehicle. The suspect vehicle had circled the block in the vicinity of the gas station. The police promptly activated their warning lights and stopped the vehicle.

Both the driver of the vehicle[2] and his passenger, Mr. Silva, appeared to be under the influence of marijuana. In fact, the men asked the police if they had been stopped "because we were smoking weed?"[3] The witness from the scene viewed the defendant, his traveling companion, and their vehicle. She identified all three, stating that he defendant was the person who had fired the shots that the car in the gas station.[4]

Police subsequently learned the identity of the operator of the vehicle which had been shot at by Mr. Silva. The driver, known to police for reasons independent of the shooting at the gas station, denied knowing who had shot at him or why the shots were fired. Police inspected his vehicle, which had been taken to a local auto body shop, and recovered bullets from workers at the business. Ballistic testing undertaken by authorities confirmed that the bullets had been fired by the gun found at the scene.

Based on these and other events, Agent DeSantis provided an affidavit in support of an arrest warrant and criminal complaint charging Mr. Silva with violation of 18 U.S.C. § 922(g), being a felon in possession of a firearm. This Court now finds that Agent DeSantis's credible testimony is sufficient to find probable cause that the defendant committed the offense with which he is charged.

### 3. The November 20, 2000 shooting incident in Brockton, Massachusetts.

Agent DeSantis also recounted an incident involving the defendant in the early morning hours of the day following the incident in Dorchester. According to the Agent DeSantis, that morning three armed

---

in interstate commerce prior to arriving in Massachusetts.

2. Mr. Silva's driver was subsequently identified as the same man who had been with him during the shooting incident on March 5, 2000 in Brockton.

3. A search subsequent to the arrest of the defendant and his companion yielded substances believed to be cocaine base and marijuana.

4. The witness noted that the driver and passenger had changed into one another's clothes.

gunmen broke · into the home where, as noted previously, Mr. Silva resided with his family. Police reports indicate that Mr. Silva's youngest brother was awakened by a masked intruder who put a gun to his head and asked, "Where is the money?" After a brief search of the room in which the boy slept, similar threats and inquiries were made of the defendant's mother and other siblings. Evidently, none of the defendant's family was sufficiently knowledgeable about the existence of the money sought, and they were then closed into a room.

The search of the defendant's home continued, and the intruders made their way to the room in which Mr. Silva and his girlfriend were sleeping. Because the door to that room was "deadbolted," the intruders forced their way inside. The intruders demanded that Mr. Silva "give us the money." Mr. Silva's girlfriend laid herself atop of Mr. Silva in an effort to protect him[5] as the intruders fired shots at the defendant before fleeing the home. One of the shots hit him in the right ankle, the other in the left hip area. Police recovered a nine millimeter shell casing from Mr. Silva's bedding. Mr. Silva disavowed any knowledge as to why he might have been targeted for the invasion.

Agent DeSantis's final area of testimony related to a search of the defendant's home on January 12, 2001 and statement he allegedly made thereafter. On January 12th, Brockton police gained access to the home through a door that had been barricaded shut with "2″ X 4‴" boards. The defendant's family was present. In searching the home, police confiscated various contraband, including marijuana, cocaine base, scales, packaging materials, and .38 caliber ammunition. According to Agent DeSantis, Mr. Silva thereafter allegedly made statements to a close "associate" to the effect that he intended to flee the district (and possibly the country) to avoid prosecution.

Relying on the events described above, the government thus laid its groundwork for arguments regarding Mr. Silva's dangerousness to the community. The government succinctly described, not necessarily inaccurately, that the defendant is "out of control" and poses a grave risk to others. In moving for detention on the ground of dangerousness, the Assistant United States Attorney offered a rather compelling and cogent argument. He focused specifically on the argument that the defendant has committed a crime of violence, i.e., being a felon in possession of a handgun, and briefly touched on, then abandoned, an argument based on the defendant's habitual criminality. Each of these arguments is considered more fully below.

In addition, the government pursued its argument that Mr. Silva poses a serious risk of flight. The government noted that Mr. Silva's purportedly has an intention to flee, as indicated by his statements to that effect. The government argued that the Court should take such statements seriously, given that Mr. Silva now faces significant periods of incarceration (ten years imprisonment) for the offenses previously described. The government further argued that it expects to seek additional charges against Mr. Silva. The government suggests that all of this information portends that Mr. Silva poses a significant risk of flight in addition to his dangerousness.

With this background in mind, the Court now turns to the detention calculus.

 The Court's independent analysis regarding detention is governed by the rubric set forth in 18 U.S.C. § 3142(g). Pursuant to the Bail Reform Act of 1984, this Court shall detain a criminal defendant pending trial upon a determination that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the

5. The Court notes that PSO reports that the defendant's girlfriend is now four months pregnant. As such, she may have been pregnant during the home invasion.

safety of any other person and the community ..." 18 U.S.C. § 3142(e). "With regard to risk of flight as a basis for detention, the Government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's appearance at future court proceedings." *United States v. DiGiacomo,* 746 F.Supp. 1176, 1180–81 (D.Mass.1990). The burden of persuasion remains with the Government on the question of flight risk. *See DiGiacomo,* 746 F.Supp. at 1181, *citing United States v. Jessup,* 757 F.2d 378, 381–82 (1st Cir. 1985).

■ The issue of whether the defendant poses as a danger to the community has a different requirement. The Government must prove by clear and convincing evidence that no combination of conditions will reasonably assure the safety of any other person and the community. *United States v. Chimurenga,* 760 F.2d 400 (2d Cir.1985). The meaning of clear and convincing evidence does not imply that the judge be "plumb sure" that there is no set of conditions that will protect the public, but the judge should be "pretty sure." *United States v. Gray,* 651 F.Supp. 432, 438 (W.D.Ark.1987), *aff'd.,* 855 F.2d 858 (8th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 141 (1988). Nevertheless, because of the interference of pretrial detention with the "importan[t] and fundamental ... right" of liberty, *United States v. Salerno,* 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), this Court will not make such a finding lightly.

■ Pursuant to Section 3142(g), the Court first looks to the nature and circumstances of the offense charged against the defendant. There is no doubt that the circumstances of the case *sub judice,* i.e., the facts presented, are cause for great concern and alarm. But Mr. Silva is not charged here with any of the violent crimes enumerated in his state court criminal record. In this Court, not to minimize the offense, Mr. Silva is charged solely with being a felon in possession of firearm pursuant to 18 U.S.C. § 922(g). The Court must consider the *nature of that offense*—its generic makeup—in order to determine if it is *a crime of violence* separate and apart from the facts presented here.

■ Pursuant to statutory construction, in order for that offense to be a crime of violence, the crime must either be (1) a crime involving the use or attempted use of force against the person or property of another, or (2) a felony posing a substantial risk that physical force would be used against the person or property of another. *See* 18 U.S.C. § 3156(a)(4). The government asks this Court, as it did in *United States v. Powell,* 813 F.Supp. 903 (D.Mass. 1992), to reconsider its holdings that violation of Section 922(g) is not a crime of violence within the meaning of Section 3142(f)(1)(A). *See Powell, supra; United States v. Whitford,* 1992 WL 188815 (D.Mass.1992); *United States v. Martorano,* 1992 WL 73558 (D.Mass.). In support of its request, the government points to a recent opinion by the Court of Appeals for the Second Circuit, *United States v. Dillard,* 214 F.3d 88 (2nd Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1232, 149 L.Ed.2d 141 (2001), in which it analyzed the conflict among courts over this point [6] and concluded that violation of Section

---

6. The issue of whether the crime of being a felon in possession of a firearm is a crime of violence for purposes of Section 3142(f)(1)(A) has led to a split within this District, *compare United States v. Powell,* 813 F.Supp. 903 (D.Mass.1992) (not a crime of violence) with *United States v. Phillips,* 732 F.Supp. 255 (D.Mass.1990) (crime of violence), as well as two other district courts and two courts of appeals. *Compare United States v. Singleton,* 182 F.3d 7 (D.C.Cir.1999) (not a crime of violence) with *United States v. Dillard,* 214 F.3d 88 (2d Cir.2000) (divided panel holding that it is a crime of violence); *compare also United States v. Robinson,* 27 F.Supp.2d 1116 (S.D.Ind.1998) (not a crime of violence) with *United States v. Sloan,* 820 F.Supp. 1133 (S.D.Ind.1993) (crime of violence); *United States v. Gloster,* 969 F.Supp. 92 (D.D.C.1997) (not a crime of violence) with *United States v.*

922(g) is a crime of violence. Although the Court accepts the invitation to reconsider, it declines to alter its prior finding that being a felon in possession of a firearm is not a crime of violence for purposes of detention determinations.

In *Powell,* this Court noted nearly a decade ago that "there exists ... a stringent, albeit widely ignored, body of law in this Circuit on what constitutes a crime of violence," 814 F.Supp. at 907, and concluded that being a felon in possession of a firearm is *not* within that limited category of offenses. In so doing, the Court departed from the analysis set forth in *United States v. Phillips,* 732 F.Supp. 255, 262–63 (D.Mass.1990), which reached the contrary conclusion that Section 922(g) is a crime of violence of purposes of detention.

■ In analyzing this issue, it is helpful to begin with the ground common to both strands of thought. Central to both this Court's holdings and *Phillips* is the understanding that the term "a crime of violence" must be given narrow interpretation. As the court in *Phillips* recognized, when Congress authorized pretrial detention in the Bail Reform Act of 1984, 18 U.S.C. *et seq.,* it made "a dramatic departure" from preexisting law. *Phillips,* 732 F.Supp. at 260. *See also United States v. Tortora,* 922 F.2d 880, 884 (1st Cir.1990) (noting the Act "represented a watershed in the criminal law" and "transformed preexisting practice in very significant ways"). Among the significant changes afforded in the Act was an abandonment of prior philosophy providing for pretrial detention only in cases where it was necessary to assure a defendant's appearance at future proceedings. *Id.* Thus, the inclusion of dangerousness into the detention calculus was a radical restructuring of detention jurisprudence and practice.

■ But in recognition of the choppy constitutional waters upon which the Act shored, *see Powell,* this Court believes that

the offenses which constitute crimes of violence must be carefully limited to those categories of cases Congress delineated in Section 3142(f). Such restriction reflects congressional belief that there was only "a small but identifiable group of particularly dangerous defendants" as to whom stringent release conditions and threats of incarceration would be insufficient to enforce conformity with community standards of conduct. *See Tortora,* 922 F.2d at 884; *Phillips,* 732 F.Supp. at 260. Indeed, the fact that there is but a small oriel through which a court may see dangerousness was central to the Supreme Court's decision upholding the constitutionality of the Act in *Salerno.* There, the Supreme Court found that the Act passed constitutional muster because it effected only a "carefully limited exception" to the general rule that a defendant is presumed innocent until otherwise proven and deserves as full a constitutional complement of freedoms as to which he can reasonably be provided. *Salerno,* 481 U.S. at 749, 755, 107 S.Ct. 2095. *See also Tortora,* 922 F.2d at 884.

The court in *Phillips* used these parameters to find that an offense could be a crime of violence *"only if* the risk of violence is inherent in the nature of the crime ...". *Phillips,* 732 F.Supp. at 261 (emphasis furnished). Like this Court, the court in *Phillips* found that "the risk must concern the use of force during 'the course of committing the offense, not after or as a result of the commission of the offense.' " *Id.* at 261–62. Nevertheless, the court, relying on cases from within and outside this district, concluded that being a felon in a possession of a firearm is a crime of violence. According to *Phillips,*

> A felon is more likely to know that such possession is illegal and is more likely to be possessing a firearm with willful disregard for the legal obligations imposed upon him as a convicted felon. This also makes it more likely that he will commit another crime, and he will do so with a firearm in his possession. Also, posses-

(crime of violence).

sion of a firearm is an ongoing offense, and may lead to the use of a firearm. *Phillips,* 732 F.Supp. at 262–263.[7]

This Court respectfully disagreed with the *Phillips* analysis in *Powell,* and continues to do so.

To be sure, the vitality of *Phillips* remains, as is evidenced by the similar line of reasoning employed in *Dillard.* Like *Phillips,* the court's analysis in *Dillard* rightfully turns on the risk posed by the possession of a firearm. According to *Dillard,*

> Firearms are instruments designed for the use of physical force, whether legal or illegal. Apart from use for target practice or sport, firearms have no functional utility other than to threaten or cause harm to persons, animals, or property. Firearms are therefore generally regarded as essential equipment of police and military forces, designed to enable them to use violent force (and the threat thereof) for military and peacekeeping purposes. By the same token, firearms are conventionally regarded as essential equipment of criminals engaged in violent crime. While it is possible to commit violent crimes without possession or use of a gun (by using knives, bludgeons, brute force, acids, poisons, etc.), guns are without doubt the most potent and efficient instruments of violent crime. For that reason, they are undoubtedly the instrument of choice among the vast majority of violent criminals.
>
> We think it undeniable that possession of a gun also gives rise to some risk that the gun may be used in an act of violence. By definition, without possessing a gun, one cannot use a gun for the commission of a violent act; with a gun, one can. Possession of a gun increases one's ability to inflict harm on others and therefore involves some risk of violence.

> ... [T]he risk of violence results from the nature of the offense [of being a felon in possession of a firearm]. The offense is the illegal possession of a gun by a convicted felon. The dangerousness of guns and their adaptability to use in violent crime is why Congress has prohibited their possession by convicted felons. Criminals who are intent on committing bank robberies, murders, extortions and other crimes of violence characteristically possess guns to aid them in such criminal acts. Without possession of guns such persons are far less capable of committing acts of violence ... By possessing guns in violation of [the] law, previously convicted criminals increase the risk that they may engage in violent acts. The risk results from the nature of the offense.

*Dillard,* 214 F.3d at 93.

The *Dillard* analysis thereby purports to seize upon the assumption that it is the nature of the offense, i.e., possessing a firearm, that poses the risk of violence in Section 922(g) cases. But a closer reading of the court's analysis belies any such reliance on the stated assumption—for *Dillard* relies on truisms (e.g., "[f]irearms are instruments designed for the use of physical force, whether legal or illegal ...") to transform improperly the risk of danger from the particular person in possession of the firearm to the generic offense of illegally possessing the firearm.

The Second Circuit correctly notes that there is an inherent risk of danger in possessing a firearm, regardless of the identity of the possessor. Following this line of thought, a risk is not mitigated by the lawfulness of the possessor—for even well-meaning, responsible, and honest Americans may inadvertently pose a risk to themselves or their families by possessing guns. Guns may be accidentally found by children unschooled on safe handling of

**7.** The court in *Phillips* further notes a belief that categorizing Section 922(g) as a crime of violence is consistent with Congress's intent in promulgating Section 922(g)'s predecessor because Congress believed that no felon could be trusted to have a gun. *Id.* at 263.

such weapons; guns may be accidentally discharged by even skilled handlers. And, as in this case, guns may be taken or stolen from their lawful owners and used subsequently during the course of violent crimes. These risks, however, are acceptable ones in the *Dillard* analysis—a point which this Court, in recognition of the Second Amendment to the U.S. Constitution, must also accept.

*Dillard,* however, presupposes an unacceptable risk when the possessor is a felon. Indeed, the crux of the *Dillard* rationale is the assumption that when the possessor of the firearm is a felon, there is a greater risk of danger. According to *Dillard,* felons—regardless of the nature of the underlying conviction—all pose a risk of using the firearm in a dangerous and illegal manner. As the Second Circuit put it, "[b]y possessing guns in violation of the [law], previously convicted criminals increase the risk that they may engage in violent acts." *Dillard,* 214 F.3d at 93. This Court does not agree.

To be sure, many felons have committed violent offenses. Perhaps there is something in their nature, whether innate or acquired, biological or social, that has led them down the path of violence and mayhem. But it is the individuality of that person that is key to that dangerousness, for there are other felons who have not committed violent offenses, or even offenses in which violence is implicated. Take, for one example, the father who fails repeatedly to pay child support in violation of 18 U.S.C. § 228(c)(2), or the person who

willfully attempts to evade individual income taxes in violation of 26 U.S.C. § 7201. Neither offense is within the ambit of "white collar offenses" exempted from the statute by 18 U.S.C. § 922(a)(20)(A). Each has committed a felony, but neither is necessarily a violent offender because of their crime. Both would be proscribed from possessing a handgun as both have been convicted of a felony. And should they choose willfully to disobey the law, or inadvertently do so, and permit a firearm to be in their home, they would both be guilty of being a felon in possession of a handgun. Despite that culpability, however, neither has necessarily been magically transformed into a violent criminal, and this Court does not believe that they necessarily pose a risk of committing a violent felony merely because they now possess a firearm.[8] As such, the *Dillard* analysis cannot hold, at least in its entirety.

Furthermore, the Court of Appeals for the District of Columbia has doubted the validity of the assumptions underlying *Phillips* and *Dillard.* In *United States v. Singleton,* 182 F.3d 7, 14 (D.C.Cir.1999), the court faced an argument similar to that adopted by *Dillard* and *Phillips,* i.e., that a felon possessing a firearm is more likely to use it in a crime of violence. Rejecting that suggestion, the court in *Singleton* found that the "theory is laden with factual assumption for which the government offers no empirical support." *Id.* at 14. So, too, here.[9]

---

8. Conversely, the fact that felon who has committed a violent felony (say, for example, armed robbery of a bank or kidnaping), but who does not possess a firearm is not less likely to commit another violent offense. Furthermore, the barbarous felon has any number of tools at his disposal should he choose to commit a subsequent violent crime. Indeed, as the media in this District has reported repeatedly of late, the number of homicides in Boston this year at the hands of knife-wielding assailants is greater than those committed with firearms. *See, e.g.,* Frankie Latour, "City Seeing Rapid Rise in Deaths by Stabbing," The Boston Globe, February 14,

2001, at B1, 2001 WL 3919508; Frankie Latour, "Knifings, Peddling of Blades Targeted Ordinance Sought Against Street Sales," The Boston Globe, February 7, 2001, at B1, 2001 WL 3921125.

9. Although there well may be evidence beyond anecdotal information that a convicted felon is more likely to use a firearm to perpetrate violent acts, none has been presented here and the Court is unaware of any such data. Admittedly, the suggestion of such a link has some intuitive appeal, but the stakes are too great to presume, absent an adequate factual proffer, such a link.

Moreover, as this Court noted in *Powell,* such an analysis conflicts with First Circuit law in the separate, but not entirely unrelated, area of sentencing. In *United States v. Doe,* 960 F.2d 221 (1st Cir.1992), then Chief Justice Breyer found that being a felon in possession of a firearm was not a crime of violence for purpose of sentencing guidelines. In so doing, he noted that:

One can easily imagine a significant likelihood that physical harm will accompany the very conduct that that normally constitutes, burglary or arson. It is much harder, however, to imagine such a risk of physical harm often accompanying the conduct that normally constitutes firearm possession, for simple possession, even by a felon, takes place in a variety of ways (e.g., in a closet, in a storeroom, in a car, in a pocket) many, if perhaps most, of which do not involve likely accompanying violence.

*Doe,* 960 F.2d at 224–25.

*Doe,* taken together with *United States v. Bell,* 966 F.2d 703 (1st Cir.1992), which also rejected the argument that Section 922(g) constituted a "violent felony" for sentencing purposes, suggests to this Court that it may not conclude properly that Section 922(g) qualifies as a crime of violence in detention determinations. As in *Powell,* this Court is persuaded that the synchronicity in the definitions of "crime of violence" and "violent felony" is important and illuminating and, therefore, that for purposes of detention, Section 922(g) may not be considered a crime of violence. To the extent that the government resists this conclusion by citing *Dillard,* the Court notes that the First Circuit specifically rejected *Phillips* as exemplary of a line of cases it chose not to follow in *Doe,* and that because *Dillard* is essentially a recapitulation of the *Phillips* rationale, it too is outside what this Court believes to be First Circuit precedent.

This Court, like the court in *Singleton,* continues to adhere to the belief that being a felon in possession of a firearm is not a crime of violence. As the *Singleton* court found, unanimously, the gravamen of finding an offense to be a crime of violence must necessarily turn on the nature of the offense, not the nature of the defendant.[10] Nor does the possibility of violence by a criminal instill violence into the essence of an offense, *Singleton,* 182 F.3d at 14, for any crime can become a violent one if the perpetrator so chooses. Thus, the Court is bound to find that the offense charged against Mr. Silva is not a crime of violence, notwithstanding the facts surrounding the offense here. Stated differently, the Court cannot consider Mr. Silva's individual conduct in the course of committing the offense charged. "The question is not what happened in this case but what is the nature of the offense charged ...". *Phillips,* 732 F.Supp. at 261. Thus, the frightening circumstances of the instant offense may not form the basis of finding whether, categorically speaking, the crime is one of violence.

Having concluded that Section 922(g) is not a crime of violence for purposes of detention, the Court continues with its analysis. The next step in the calculus is to consider the weight of the evidence against the defendant. Here, there is more than a modicum of evidence. There is an eyewitness account of the crime at issue, and an identification of the defendant as the culpable person. Although the larger course of criminal conduct gilds the lily of Mr. Silva's purported criminality and culpability, it is not necessary to the Court's finding that there is probable cause to believe that he possessed a firearm in violation of Section 922(g).

Third, the history and characteristics of the defendant must be considered. As previously indicated, the Court has the benefit of a report by the PSO regarding

10. "What a felon does or does not do with the weapon neither adds to, nor subtracts from, that offense." *Dillard,* 214 F.3d at 104–105 (Meskill, C.J., dissenting.)

Mr. Silva. That report serves several functions. It documents his ties to his community, including his family. Although such information may sometimes show positive familial links that suggest a defendant may be compliant in appearing for court appearances and in de-escalating a course of violent conduct, this is not such a case. There is no indication that Mr. Silva's family may in any way alter his propensity for involvement with criminal acts or assure his appearance at future proceedings. Indeed, Mr. Silva is "graduating" in his criminality. Moreover, the Court is not persuaded by his attorney's suggestion that a recent move by his family from Brockton to a nearby district will alter his conduct.

 Mr. Silva's prior criminal record warrants an additional consideration. At the detention hearing, the Assistant United States Attorney forthrightly addressed his prior motion for detention pursuant to Section 3142(f)(1)(D), i.e., that the defendant committed a felony offense after having been convicted previously of two or more prior offenses which were crimes of violence, crimes for which life imprisonment is a penalty, or which are (or would constitute) violations of the Controlled Substance Act, 21 U.S.C. § 801 *et seq.* The government stated that in order for the defendant to qualify for such a determination, this Court must rely upon the defendant's juvenile record in order to have the requisite predicate offenses. The government conceded that this circuit has not spoken on the issue of whether a court may detain pursuant to Section 3142(f)(1)(D) on the basis of a juvenile adjudication. The government properly informed the Court that the Supreme Judicial Court of Massachusetts ("SJC") has spoken recently on a related issue of state law, holding that juvenile adjudications could not form the predicate for a "subsequent offense" enhanced penalty as a "youthful offender" pursuant to Massachusetts law. *Commonwealth v. Connor C.,* 432 Mass. 635, 738 N.E.2d 731 (2000).

In *Connor C.,* the defendant, a sixteen year old juvenile, was apprehended after his motor vehicle, subsequently determined to be stolen, lost control on a street in Lowell, Massachusetts. 432 Mass. at 636, 638–39, 738 N.E.2d 731. Upon his arrest, he was found to possess a loaded .22 caliber semiautomatic handgun with a defaced serial number. *Id.* A grand jury of the Commonwealth subsequently indicted him on various offenses, including an indictment for "possessing a firearm without a license, subsequent offense" in violation of Massachusetts General Laws, chapter 269, § 10(d). *Id.* at 636–37, 738 N.E.2d 731. The predicate for the offense charged was a prior adjudication for possessing a firearm without a license in violation of Massachusetts General Laws, chapter 269, § 10(a). *Id.* at 637, 738 N.E.2d 731. For that prior offense, the defendant was adjudicated in the juvenile court system and committed to the Commonwealth's Department of Youth Services for rehabilitation and monitoring. *Id.*

The legal issue presented to the SJC was whether the prior juvenile adjudication met the standard for the prior "conviction" prong requisite to the penalties of chapter 269, § 10(d). *Id.* at 640, 738 N.E.2d 731. The SJC, applying a strict construction to the statute's language, acknowledged that the Commonwealth now permits, as the result of recent amendments to its criminal codes, a court to sentence a juvenile for violent offenses directly to state prison. *Id.* at 641, 738 N.E.2d 731. Despite that alteration of prior law, however, the SJC did not find that the plain meaning of the statute's wording warranted a finding that the defendant's prior juvenile adjudication was sufficient predicate for the repeat offender provision. Chief Justice Marshall, writing for the SJC, focused on the remedial nature of the juvenile justice system. As she noted, the amendments permit the Commonwealth to proceed against a juvenile in adult court. Those amendments, however,

did not eviscerate the longstanding principle that the treatment of children who offend our laws are not criminal proceedings. Notably, [the amendments] did not amend G.L. c. 119, § 53, which declares the legislative policy that operative provisions of the statutes shall be liberally construed to require rehabilitative "aid, encouragement, and guidance" rather than criminal dispositions for children who offend. Moreover, even as to the category of children adjudicated "youthful offenders," the statute does not label a "youthful offender" proceeding as "criminal." The distinction our law recognizes between child and adult adjudication exists partly to avoid the infringement of a child's constitutional rights, and partly to avoid the attachment of criminal stigma to children who may be amenable to rehabilitation.

*Connor C.*, 432 Mass. at 641–42, 738 N.E.2d 731 (citations omitted).

After further analysis, the SJC thereafter repeated that it continued to adhere to its "longstanding jurisprudence that an 'adjudication' that a child has violated a law generally is not a 'conviction' of a crime." *Id.* at 646, 738 N.E.2d 731.[11]

The Court is persuaded of the soundness of the SJC's reasoning, and defers to its determination of the proper use of juvenile adjudications by the Commonwealth's courts. In this matter of apparent first impression,[12] the Court holds that the government could not rely properly on Mr. Silva's juvenile adjudications in order to invoke the criminal recidivism provision set forth in Section 3142(f)(1)(D) and that the government properly abandoned those arguments at the hearing. In so holding,

the Court notes that Mr. Silva's juvenile record is replete with a plethora of serious offenses, including narcotics violations, violent crimes, and other affronts. His adult record is equally prodigious, but not within ambit of Section 3142(f)(1)(D). If ever there was a case to tempt the Court to set aside the law, this is the one. The Court, however, shall resist that temptation.

However, the Court may consider properly the government's argument that the defendant poses a significant risk of flight and should be detained on that ground. Here, the government presented evidence not only of the significant penalties Mr. Silva faces for the offense charged, but also of his stated intention to flee the district in an effort to avoid prosecution. The Court finds that notwithstanding Mr. Silva's counsel's efforts to cast doubt on the somewhat skeletal representations of the latter by Agent DeSantis, the agent was sufficiently credible in his testimony. The Court finds that there is a real and genuine risk of Mr. Silva's flight that cannot be vitiated by any condition or combination of conditions of release.

Based on these findings and the factors outlined above, this Court accordingly ORDERS that the defendant FILLISANGELO SILVA be DETAINED pending trial. Further, pursuant to 18 U.S.C. § 3142(i) it is ORDERED that:

1. The Defendant be, and hereby is, committed to the Custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

---

11. In a companion case, *Commonwealth v. Valiton*, 432 Mass. 647, 737 N.E.2d 1257 (2000), the SJC reached a different result in the context of the Commonwealth's statutory punishment enhancement provisions for repeat offenses of driving a motor vehicle while under the influence of an intoxicating liquor. Because that limited exception is not implicated here, the Court need not discuss it further.

12. The issue was noted, but not addressed, in *United States v. Phillips*, 1989 WL 156198, *2 (D.Mass.) The government noted at hearing that it had researched the issue, but could not find precedent for in the federal system and this Court is not aware of any such guidance.

116

2. The Defendant be afforded reasonable opportunity for private consultation with his counselor; and

3. On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which the Defendant is confined shall deliver the Defendant to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

Review of this Order may be obtained by Defendant's filing of a motion for revocation or amendment pursuant to 18 U.S.C. § 3145(b).

SO ORDERED.